UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JEFFREY J. DEL FUOCO,

                Plaintiff

vs.

ROBERT E. O'NEILL,
in his personal and individual capacity;

CASE No. 8:09 CV 1262T27 MAP

PAUL I. PEREZ,
in his personal and individual capacity;

and,

JAMES R. KLINDT,
in his personal and individual capacity;

                Defendants

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

JEFFREY J. DEL FUOCO , Plaintiff, a former Assistant United States Attorney in and

for the Middle District of Florida, hereby sues ROBERT E. O'NEILL, presently an

Assistant United States Attorney in and for the Middle District of Florida, in the said

ROBERT E. O'NEILL's  personal and individual capacity; PAUL I. PEREZ, formerly a

United States Attorney in and for the Middle District of Florida, in the said PAUL I.

PEREZ's personal and individual capacity; and JAMES R. KLINDT, in the said JAMES

R. KLINDT's personal and individual capacity, and alleges:

## JURISDICTION AND VENUE

1.  This action is brought pursuant to *Bivens v. Six Unknown Named Agents of the*

*Federal Bureau of Narcotics,* 403 U.S. 388 (1971); Pursuant to Title 42, United States

1

Code, Sections 1985 and 1986; and, pursuant to the doctrine of supplemental jurisdiction over related state claims, which are set forth herein.

2.   This Court has jurisdiction under Title 28, United States Code, Sections 1331 and 1367.  In this case, Federal questions present themselves under *Bivens,* the Constitution and under Federal law.  Furthermore, related State claims included are so related to the original Federal claims that they are properly included under the pendent jurisdiction doctrine.

3.   Venue is proper in the Middle District of Florida pursuant to Title 28, United States Code, Section 1391.  Both the Plaintiff and the Defendants reside in this district, and a substantial part of the events and omissions giving rise to the instant case occurred in this District.

4.   All conditions precedent have been satisfied prior to filing suit in this cause.  Since the Defendants are being sued in their personal and individual capacities, the provisions of the Federal Tort Claims Act (FTCA) are not applicable to this case.  Specifically, neither the U.S. Government nor the U.S. Department of Justice are defendants in this matter.

## INTRODUCTION

At all times material to this action:

5.   George W. Bush was a member of the Republican Party and was the elected President of the United States, heading the Executive Branch of the Government of the United States.  One of the Executive Branch agencies under Mr. Bush's authority and control was the U.S. Department of Justice, including the Office of the U.S. Attorney for the Middle District of Florida.

6.   John Ellis ("Jeb") Bush was the elected Republican Governor of the State of Florida. Mr. Bush was the brother of the President of the United States, George W. Bush. As Governor, Mr. Bush served in a pivotal role to Florida's Federal Judicial Nominating Commission (JNC), and had personal and substantial influence over the selection of appointees for Federal judgeships and certain federal law enforcement posts (including the appointment of U.S. District Judges and U.S. Attorneys) in all 3 of Florida's federal districts, including the Middle District of Florida. The official endowed with the power to make the nominations for these appointments was the President of the United States, George W. Bush.

7.   John Ashcroft, Alberto Gonzalez and later Michael B. Mukasey were the appointed Republican Attorneys General of the United States and were Cabinet members and advisors to President Bush. Messrs. Ashcroft, Gonzalez and Mukasey headed up the U.S. Department of Justice and reported directly to the President. Messrs. Ashcroft and Gonzalez were at times the immediate superiors of Defendant PAUL I. PEREZ in the Presidential appointment chain. Mr. Gonzalez was at one point the direct superior to Defendant JAMES R. KLINDT as interim U.S. Attorney, and later, Mr. Mukasey was the direct superior of Defendant ROBERT E. O'NEILL when he was appointed as interim-U.S. Attorney. Defendant ROBERT E. O'NEILL was so appointed on the recommendation of Defendant KLINDT. All mentioned had a duty and responsibility to address the misconduct described herein once fully apprised, and all failed (for apparent political reasons) to do so.

8.   Charles B. ("Charlie") Wells was the elected Republican Sheriff of Manatee County, Florida and headed up the Manatee County Sheriff's Office (MCSO). Wells held this

elected political post for 23 years. Wells was a close personal friend, policy advisor, political ally and fundraiser for "Jeb" Bush. Wells was also a self-proclaimed personal friend to President Bush, and at times publicly discussed his status and friendship with the President and the Bush family. His friendships with the Governor and the President were strong enough that Wells named two MCSO dogs "Jeb" and "George", all in honor of his friendship with them. In a March 30, 2008 *St. Petersburg Times* article outlining the Plaintiff's investigation of Charles B. Wells, Jeb Bush publicly referred to Charles B. Wells as "a fine man", all despite conclusive proof that Wells had violated the law by engaging in the illegal, *de facto* loan and IRS scheme set forth herein.

9.   Defendant ROBERT E. O'NEILL has stated publicly in sworn testimony that Sheriff Wells, *et al.* was the subject of one or more Federal criminal investigations being conducted in the Middle District of Florida. In addition, both Wells and Defendant ROBERT E. O'NEILL have said publicly that those criminal investigations were being conducted by Plaintiff JEFFREY J. DEL FUOCO in his capacity an Assistant United States Attorney in and for the Middle District of Florida. According to Wells, one of those inquiries was a grand jury investigation into certain interstate, *de facto* bank loans (a/k/a "lease-purchase" transactions) entered into by Wells that was conclusively determined by public audit to have illegally used public property as collateral, resulting in the unlawful receipt of approximately $8,500,000.00 . The public property at issue was owned by the people of Manatee County, Florida.

10.   Defendant ROBERT E. O'NEILL's public statements about the Plaintiff's investigation of Charles B. Wells were unauthorized; were undertaken beyond the scope of his employment and authority; and were false in several particulars. As such, since

Defendant ROBERT E. O'NEILL lied under oath about Plaintiff's investigation of the said Charles B. Wells, he "opened the door" for Plaintiff to correct the record. This lawsuit is brought in part to correct the false impressions made to the public, and to expose Defendant ROBERT E. O'NEILL's false and fraudulent public statements about Plaintiff's investigation for what they were and are – unlawful attempts to protect and shield a friend of the former Bush Administration from public scrutiny and possible prosecution, all for selfish, parochial political gain.

11.   Defendant PAUL I. PEREZ knew that Defendant ROBERT E. O'NEILL's public statements about the Plaintiff's investigation of Charles B. Wells were unauthorized, were undertaken beyond the scope of the said Defendant ROBERT E. O'NEILL's authority and were false.  Further, Defendant PAUL I. PEREZ had a duty to take corrective action about those falsehoods and he did not.  As such, since Defendant PAUL I. PEREZ failed to do so, this suit is brought in part to correct the record about his role as well.

12.   Defendant PAUL I. PEREZ was the Republican appointed United States Attorney for the Middle District of Florida, and it was well known that he aspired to become a U.S. District Court Judge.  In order to accomplish this goal, Defendant PAUL I. PEREZ was required to submit his application to the Florida Federal JNC, with which Governor Jeb Bush, Wells' friend and political ally was substantially affiliated.

13.   Defendant JAMES R. KLINDT was a Republican and the appointed First Assistant United States Attorney for the Middle District of Florida, reporting directly to Defendant PAUL I. PEREZ.  Defendant KLINDT (a long-time associate of PEREZ) told another person that the plan was for him to become the Presidentially-appointed United States

Attorney for the Middle District of Florida upon Defendant PAUL I. PEREZ's hoped for

ascension to the Federal bench.  Later, Defendant KLINDT became the interim-U.S.

Attorney prior to being appointed as a U.S. Magistrate Judge.

14.   At times pertinent to the misconduct outlined in this Complaint, Defendants PAUL

I. PEREZ and JAMES R. KLINDT had wrongful, unethical and personal, direct, face-to-

face meetings and briefings with Charles B. Wells to discuss the Plaintiff and his lawsuit

against Wells and others.  These face-to-face meetings with Charles B. Wells were also

held to discuss the status of a Florida Department of Law Enforcement (FDLE) criminal

investigation that was confidential in nature, and that implicated Charles B. Wells and

certain family members and associates of his in apparent criminal activity.

15.   The meetings and briefings that Defendants PAUL I. PEREZ and JAMES R.

KLINDT had with Charles B. Wells placed both of them in a position where it could

appear that they were being improperly influenced by the said Charles B. Wells.

According to a nationally known expert on legal ethics,  the situation described set forth

herein caused a "danger of what (the said Charles B. Wells) might say even if it's not a

conversation the U.S. attorney wants to have."  According to this expert, "there may be

no fire, just smoke, and you can *undermine public confidence*."

16.   Warren A. Zimmerman was the Chief of the Civil Division in the Office of the

United States Attorney for the Middle District of Florida, and reported directly to

Defendants PAUL I. PEREZ and JAMES R. KLINDT.  At certain times pertinent, Mr.

Zimmerman was also the direct supervisor of the Plaintiff.  Among other things, Mr.

Zimmerman served as the "legal advisor" for the DOJ when Defendant ROBERT E.

O'NEILL gave false and defamatory *per se* public testimony in the case of *Del Fuoco v.*

*Wells, et al.*, MDFL Case No. 8:03-CV-161-T-23TGW.   Despite later being told about

Defendant ROBERT E. O'NEILL's perjury, Zimmerman took no action to correct it,  or

to inform the Court of the fraud perpetrated upon it.

17.   Robert Mosakowski was the Chief of the Tampa Criminal Division in the Office of

the United States Attorney for the Middle District of Florida, and reported directly to

Defendant ROBERT E. O'NEILL.   At certain times, he was also an indirect supervisor of

the Plaintiff.  Mr. Mosakowski, on several occasions participated in meetings, drafted and

filed pleadings for filing with the court and aided and abetted in the illegal actions and

statements of Defendants ROBERT E. O'NEILL and PAUL I. PEREZ, *inter alia*.  Mr.

Mosakowski is also a material witness to public statements made by Defendant ROBERT

E. O'NEILL, including the statement by  Defendant O'NEILL, who told *"Bob*

*Mosakowski, who runs Tampa, I had numerous conversations that the 'guy'* (meaning,

Plaintiff) *is mentally ill. . . . "*

18.   Joseph Burnhart was a Sergeant in the Manatee County Sheriff's Office (MCSO) and

a 20+ year veteran of that law enforcement agency.  Sergeant Burnhart headed up an

enforcement unit in the MCSO and supervised Deputy Sheriff Larry Bahnsen, the

brother-in-law of Sheriff Wells.  Sergeant Burnhart came forward with evidence and

testimony proving that members of the MCSO, including Bahnsen, were engaged i   a

plan to stalk and to cause physical and other harm to Plaintiff JEFFREY J. DEL FUOCO

and members of his family, including his wife, his ex-wife and minor children, *inter alia*.

19.   Mark K. Flint was a 37 year veteran of law enforcement, and was a long-time

member and Special Agent (S/A) of the Florida Department of Law Enforcement

(FDLE).  At times pertinent, S/A Flint was the lead case agent working with Plaintiff

JEFFREY J. DEL FUOCO on the investigation, indictment and prosecution of certain members of the so-called "DELTA Squad" of the MCSO, all corrupt members of law enforcement who routinely stole from citizens, lied under oath, distributed narcotics, obstructed justice, violated the civil rights of citizens, and otherwise abused their positions of trust.

20.   A certain unindicted co-conspirator member of the "DELTA" Squad was a close personal friend and associate of Sheriff Charles B. Wells as well as with Defendant ROBERT E. O'NEILL.  At times pertinent, that individual was represented by a nationally-known, prominent Tampa, Florida-based criminal defense attorney who also had a friendship with and personal access to Defendant ROBERT E. O'NEILL.

21. Because of Defendant ROBERT E. O'NEILL's  close  personal friendship with the unindicted co-conspirator mentioned, *supra,* he was officially and formally recused from any DOJ supervisory role whatsoever in Plaintiff's criminal investigation and possible indictment of the said unindicted co-conspirator.  Despite this acknowledged  conflict of interest, Defendant ROBERT E. O'NEILL ignored the recusal, and participated personally on behalf of this individual, all to that individual's substantial and undeserved benefit.

22.   Armand T. Cotnoir was a Plant City Police Department (PCPD) narcotics officer convicted by the Plaintiff in a major police corruption case.  Cotnoir provided additional evidence demonstrating that Defendant ROBERT E. O'NEILL was engaged in illegal efforts to obstruct and impede the Plaintiff's ongoing investigation of Cotnoir's co-conspirators in the PCPD.

23. John Doe #1 was a "Federal officer" within the meaning of the law and was an Assistant United States Attorney in and for the Middle District of Florida. At times pertinent, Mr. Doe #1 was the direct supervisor of Plaintiff JEFFREY J. DEL FUOCO, and in that capacity, attempted to support and defend the Plaintiff's honest prosecutorial efforts. At times pertinent, Mr. Doe #1 also attempted to work with S/A Mark K. Flint of the FDLE in investigating threats of physical violence made against Plaintiff and his family by members of the MCSO, including Wells' brother-in-law. Mr. Doe #1 was further the victim of severe employment retaliation directed at him by Defendants ROBERT E. O'NEILL, PAUL I. PEREZ, JAMES R. KLINDT and AUSA Robert Mosakowski for attempting to support Plaintiff's honest prosecutorial efforts. This retaliation took place shortly after reports of some of the misconduct described herein were reported to Attorney General Ashcroft in an effort to seek help and assistance. The unlawful retaliation against Mr. Doe #1 was a vicarious attempt to punish the Plaintiff, who was characterized by Defendant PAUL I. PEREZ as having "paralyzed" him, Defendant JAMES R. KLINDT and the other co-conspirators.

24. Ernest F. Peluso was an Assistant United States Attorney in and for the Middle District of Florida and was a colleague of Plaintiff JEFFREY J. DEL FUOCO. Mr. Peluso was unlawfully used as a vehicle by Defendant ROBERT E. O'NEILL to "tell Del Fuoco I'll whip his fuckin' ass", *inter alia.*

25. Jeffrey S. Downing was an Assistant United States Attorney in and for the Middle District of Florida and like Mr. Peluso, was a colleague of the Plaintiff. Mr. Downing was also unlawfully used by Defendant ROBERT E. O'NEILL to tell the Plaintiff that he (Defendant ROBERT E. O'NEILL) would "whip his motherfucking ass", *inter alia.*

26.  John Doe #2 was an Assistant United States Attorney in and for the Middle District of Florida and was a colleague of Plaintiff JEFFREY J. DEL FUOCO.  John Doe #2 was a "Federal officer" within the meaning of the law.  At one point, Mr. Doe #2 was a section chief.  In retaliation for reporting the possible theft of more than $800,000.00 of forfeited drug money from the DOJ's "Equitable Sharing" program, Mr. Doe #2 was demoted by Defendants PAUL I. PEREZ and JAMES R. KLINDT from his chief's position and reassigned as a line AUSA.  This misconduct was reported to the appropriate officials of the Department of Justice by Plaintiff JEFFREY J. DEL FUOCO. Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT knew that Plaintiff had made the reports about the possible theft of the more than $800,000.00 and the retaliation against Mr. Doe #2 to officials of the DOJ.

27.  The U.S. Office of Personnel Management (OPM) had regulations prohibiting federal employees (including members of the U.S. Attorney's Office for the Middle District of Florida) from engaging in "criminal, infamous, dishonest, immoral, and notoriously disgraceful conduct prejudicial to the Government."

28.  The U.S. Office of Government Ethics (OGE) also required Executive Branch employees of the Federal Government to adhere to all laws and regulations that provide equal opportunity for all Americans.

29.  The U.S. Department of Justice's (DOJ's) supplemental standards of conduct prohibited DOJ employees from engaging in "disrespectful conduct", including the use of "insulting, abusive, or obscene language about others."  These restrictions extended to personnel of the U.S. Attorney's Office for the Middle District of Florida.

30.  In this regard, each employee whose conduct on and off duty reflects upon the Federal Government is "required to refrain from any activity which would adversely affect the reputation of the Department of Justice, and demonstrate the highest standards of personal and moral conduct expected of law enforcement officers and other government employees."

31.  The U.S. Department of Justice had several policies and procedures in place that prohibited conflicts of interest and the consideration of personal friendships and political affiliations in the conduct of criminal investigations.  These prohibitions extended to the activities and operations of the various U.S. Attorneys' Offices, including the Middle District of Florida, and required the recusal and non-involvement of any DOJ prosecutor whose impartiality might be questioned in a particular matter as a result of the relationship in question.

32.  Further, the U.S. Department of Justice had numerous policies and procedures in place that required the reporting of professional and other misconduct by DOJ personnel to appropriate DOJ officials in Washington.  These reporting requirements extended to personnel employed in the various U.S. Attorneys' Offices, including the Plaintiff.

33.  Further, the U.S. Department of Justice had several policies and procedures in place prohibiting retaliation against employees for reporting professional and other misconduct by DOJ personnel to appropriate DOJ officials in Washington.  These prohibitions and protections extended to personnel employed in the various U.S. Attorneys' Offices, including the Plaintiff.

34.  Further, the U.S. Department of Justice had several policies and procedures in place prohibiting the unauthorized release of personnel records and information (false,

11

fraudulent or otherwise) about employees, all as required by the Privacy Act of 1974 (5 U.S.C. 552a), *inter alia*. These prohibitions and protections extended to personnel employed in the various U.S. Attorneys' Offices, including the Plaintiff.

35.   Further, the U.S. Department of Justice had several policies and procedures in place for the protection of its employees and their families from harm and threats of harm in retaliation for their *bona fide* law enforcement activities. These duties extended to personnel and the families of personnel employed in the various U.S. Attorneys' Offices, including the Plaintiff and his family.

36.   Further, the U.S. Department of Justice had several policies and procedures in place concerning, and was charged by Federal law with enforcing, those laws prohibiting perjury and retaliation against witnesses, *inter alia*. Implicit in those duties was the requirement that DOJ employees not commit perjury, retaliate against witnesses, or otherwise violate the law themselves. These duties extended to personnel employed in the various U.S. Attorneys' Offices, including the Defendant ROBERT E. O'NEILL.

37.   Further, the U.S. Department of Justice had several policies and procedures in place concerning, and was charged by Federal law with enforcing, those laws prohibiting discrimination in employment, and the illegal and unconstitutional use of a DOJ employee's ethnic and religious background as a basis for discriminating against him, harassing him or retaliating against him in any manner. Furthermore, the DOJ required its managers to respect the Equal Employment Opportunity (EEO) rights of DOJ employees, and to refrain from any conduct evidencing discrimination based upon "race, color, religion, sex, age, national original, disability (physical or mental), sexual orientation or reprisal." The official DOJ policy further required "holding supervisors

and managers *strictly accountable* for EEO implementation" and further, to "(p)roviding a work environment *free of discrimination and harassment."* Finally, the official EEO policy of the DOJ declared that *"employees who elect to (report violations) are protected from retaliation and reprisal"* (Emphasis supplied). A Complete copy of the policy is attached hereto and incorporated herein as if set forth fully as <u>Exhibit A.</u>

38. Further, the U.S. Department of Justice had several policies and procedures in place, and required its employees to act lawfully and within the scope of their duties and employment when conducting Department business and when dealing with Department personnel. These duties extended to personnel employed in the various U.S. Attorneys' Offices, including Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT.

39. It was outside the scope of their employment for DOJ personnel, including Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT, to take into account personal friendships, political affiliations, perceived political power, political contacts and other political "juice" in determining who would or would not be subject to investigation for criminal or other misconduct within the Department's jurisdiction.

40. It was further outside the scope of their employment for DOJ personnel, including Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT to meet personally with the subjects or the relatives of the subjects of criminal investigations, and to discuss with such outside persons the status of investigations, personnel and other confidential matters private to the U.S. Attorney's Office, the U.S. DOJ, the FDLE and other law enforcement agencies, *inter alia.*

41.  It was further outside the scope of their employment for DOJ personnel, including Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT,  to threaten beatings and bodily injury to subordinate colleagues; to harass subordinate colleagues during the federal work day or at any time;  to retaliate against subordinate colleagues for lawfully identifying and reporting possible crimes and other misconduct to the Department;  to harass,  molest and interfere with the employment of subordinates for not being "team players" or for other reasons; to wrongfully withhold promotions, pay and benefits to subordinate colleagues for not supporting illegal and unethical positions; to wrongfully use the ethnic background and religious preferences of subordinate colleagues as harassment tools and to send not so subtle "messages" to them about their continued employment status;  to otherwise use fear and intimidation as tools for the implementation of favors, unlawful political objectives and perceived personal gain; to unlawfully meet with the subjects of investigations and with other persons in order to provide "inside information" on the status of matters within the U.S. Attorney's Office, and, to wrongfully disclose false, defamatory *per se*, Privacy Act protected information about subordinates in efforts to publicly embarrass, humiliate and force their constructive discharge, *inter alia.*

42.  It was further outside the scope of their employment for DOJ personnel, including Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT, to lie under oath or otherwise in judicial and Florida Bar proceedings; to obstruct justice; to retaliate against witnesses; to hide possible criminal activity, or to otherwise punish subordinate colleagues for reporting misconduct and possible criminal violations to the

Department, including retaliation and punishment for those who supported others in doing so.

43. It was further outside the scope of their employment for DOJ personnel, including Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT, to render and authorize to render, and later to aid and abet in the rendering of false, malicious, retaliatory and defamatory *per se* testimony such as given by Defendant ROBERT E. O'NEILL on July 12, 2005 in the case of *Del Fuoco v. Wells, et al.*, all in an obvious effort to assist Charles B. Wells and certain associates for apparent political gain and support.

44. It was further outside the scope of the duties of a lawyer and a member of the legal profession to lie and attempt to mislead disciplinary authorities (to include lying to Bar Counsel for the Florida Bar) in order to escape detection and appropriate sanction for engaging in prohibited conflicts of interest, in particular, Florida Bar File No. 2009-00,424(4B), in re: Defendant JAMES R. KLINDT.

## PARTIES

45. The Plaintiff, JEFFREY J. DEL FUOCO, was a lawyer and an Assistant United States Attorney in and for the Middle District of Florida. Plaintiff was a "Federal officer" within the meaning of the law. Plaintiff served in this capacity from January 9, 1995 through and including August 1, 2005. Prior to assuming these duties, Plaintiff served as Associate General Counsel and as Program Manager for Criminal Law and Enforcement Operations with the Office of General Counsel, U.S. Marshals Service. As an Assistant United States Attorney, Plaintiff was a highly successful corruption prosecutor and aggressively investigated, prosecuted and convicted numerous corrupt officials during his

tenure.  Six (6) of those corrupt officials were MCSO narcotics officers working for

Sheriff Wells in a unit known as the "DELTA" Squad.  In 2001 (shortly before George

W. Bush assumed the office of President of the United States), Plaintiff was bestowed

with the Department of Justice's "Director's Award" for "Superior Performance as an

Assistant United States Attorney."

46.  Defendant ROBERT E. O'NEILL was a lawyer and an Assistant United States

Attorney for the Middle District of Florida.  At all times pertinent to this action,

Defendant was a supervisor, and served as a Section Chief, as Chief of the Criminal

Division and in other managerial positions.   Plaintiff JEFFREY J. DEL FUOCO was at

certain times subordinate to Defendant ROBERT E. O'NEILL, and Defendant ROBERT

E. O'NEILL was at times material to this suit subordinate to Defendants PAUL I. PEREZ

and JAMES R. KLINDT.

47.  Defendant PAUL I. PEREZ was a lawyer and the United States Attorney in and for

the Middle District of Florida, appointed by President George W. Bush.

48.  Defendant JAMES R. KLINDT was a lawyer and the First Assistant United States

Attorney in and for the Middle District of Florida, appointed by Defendant PAUL I.

PEREZ.

## COUNT ONE

### Common Law Conspiracy, Conspiracy to Violate the Privacy Act (5 U.S.C. 552a)

### and

### Conspiracy to Impede a Federal Officer [42 U.S.C. 1985(1)]

49.  Plaintiff repeats and realleges the assertions contained in paragraphs 1 through 48

above, inclusive.

50. From an unknown date, but at least from on or about January 20, 2001 through and including at least on or about August 12, 2005 and at times thereafter up to and including the present time, in the Middle District of Florida and elsewhere, the Defendants, ROBERT E. O'NEILL, PAUL I. PEREZ, and JAMES R. KLINDT, acting outside the scope of their employment as employees of the U.S. Department of Justice, did knowingly, willfully and tortiously combine, conspire, confederate and agree together and with other persons, both known and unknown to the Plaintiff, to do unlawful acts, and to do lawful acts by unlawful means, with the manner, means and object of causing damage to the Plaintiff, and in fact causing such damage, to include, but not be limited to releasing false, defamatory *per se* and Privacy Act protected information about the Plaintiff, to interfere with his employment, to interfere with his private cause of action in the case of *Del Fuoco v. Wells, et al*; and to knowingly, willfully and tortiously combine, conspire, confederate and agree together and with other persons, both known and unknown to the Plaintiff, to prevent the Plaintiff and others by force, intimidation and threat from discharging their duties as Assistant United States Attorneys in and for the Middle District of Florida, an office, trust and place of confidence under the United States, and to injure the Plaintiff directly and vicariously through others in their person and property on account of the lawful discharge of the duties of his office and while engaged in the lawful discharge thereof, and to injure Plaintiff's person and property so as to molest, interrupt, hinder and impede the Plaintiff directly and vicariously through others in the discharge of his and their official duties, *to wit*:

## **Objects, Manner and Means of the Conspiracy**

51.  It was part of the said conspiracy that the conspirators would and did knowingly, intentionally, tortiously and unjustifiedly interfere and attempt to interfere with the Plaintiff's employment both directly and vicariously through other as Assistant United States Attorneys in and for the Middle District of Florida, causing severe damage to the Plaintiff;

52.  It was a further part of the said conspiracy that the conspirators would and did tortiously make false and defamatory *per se* statements about, of and concerning the Plaintiff to third parties and to the public at large, and would and did make such statements intentionally, with malice and in reckless disregard for their lack of truthfulness and for the Plaintiff's rights, causing damage to the Plaintiff;

53.  It was a further part of the said conspiracy that the conspirators would and did, in connection with the statements referred to *supra,* when considered alone, and without *innuendo*, knowingly, tortiously, falsely and maliciously cause the Plaintiff to be subjected to hatred, distrust, ridicule, contempt, disgrace and injury to his trade and profession, *to wit*: as an attorney at law and as an Assistant United States Attorney in and for the Middle District of Florida; and would and did tortiously, falsely and maliciously attribute to the Plaintiff conduct, characteristics and conditions incompatible with the proper exercise of a lawful business, trade, profession or office, *to wit*:  as an attorney at law and as an Assistant United States Attorney in and for the Middle District of Florida.

54.  It was a further part of the said conspiracy that the conspirators would and did

tortiously invade the privacy of the Plaintiff by publicly disclosing private facts that were

and are offensive to reasonable persons and not of legitimate public concern, causing

severe ad lasting damage to the Plaintiff;

55.   It was a further part of the said conspiracy that the conspirators would and did

tortiously invade the privacy of the Plaintiff by publicly disclosing facts that would and

did place the Plaintiff in a false light, causing damage to the Plaintiff;

56.   It was a further part of the said conspiracy that the conspirators would and did make

intentional, unlawful offers of corporal injury to Plaintiff by force, and by force

unlawfully directed toward Plaintiff's person through AUSA colleagues of the Plaintiff,

thereby creating fear of imminent peril in and around the workplace, and all with the

apparent present ability to effectuate *"whipping the Plaintiff's motherfucking ass"*, and all

as detailed, *infra.*

57.   It was a further part of the said conspiracy that certain of the conspirators would and

did become aware of, and should have become aware of the criminal and tortious

activities of Defendant ROBERT E. O'NEILL, all indicating his unfitness for the office

he held, and further that the conspirators, owing a duty to protect the Plaintiff from the

said Defendant ROBERT E. O'NEILL's criminal and tortious acts, breached said duty by

failing to take appropriate action, including but not limited to investigation, discharge or

reassignment, all proximately causing injury and damage to the Plaintiff;

58.   It was a further part of the said conspiracy that the conspirators would and did

engage in tortious, intentional, reckless and outrageous conduct causing emotional

distress, and causing the Plaintiff to suffer severe emotional distress as a result thereof;

59. It was a further part of the said conspiracy that the conspirators would and did engage in knowing and willful violations of Federal law, including violations of the non-disclosure without consent provisions of the Privacy Act of 1974, 5 U.S.C. Section 552a;

60. It was a further part of the conspiracy that the conspirators would and did engage in knowing and willful violations of Federal law, including violations of Equal Employment Opportunity (EEO) laws protecting the Plaintiff's employment from discrimination and harassment based upon his ethnic heritage (Italian-American) and perceived religious background (Roman Catholic);

61. It was a further part of the said conspiracy that the conspirators would and did engage in knowing and willful violations of Federal law, including the commission of obstruction of justice and retaliation against a witness, in violation of 18 U.S.C. Sections 1503; 1513(b)(2); 1513(e) by corruptly and by threats of force, and by threatening communications, influencing, obstructing and impeding and endeavoring to influence, obstruct and impede the due administration of justice in the case of *Del Fuoco v. Wells, et al.*, MDFL Case No. 8:03-cv-161-T-23TGW, and in other matters.

62. It was a further part of the said conspiracy that the conspirators would and did commit, condone, aid and abet perjury, lie under oath in depositions and other official proceedings, and otherwise act outside the scope of their employment and authority, in the case of *Del Fuoco v. Wells, et al.*, MDFL Case No. 8:03-cv-161-T-23TGW in efforts to (1) escape detection for violation of Department of Justice rules and Federal law; (2) minimize (for perceived political gain) the misconduct of members of the MCSO and others in their efforts to harm Plaintiff in retaliation for his lawful investigations, and; (3) to punish and otherwise retaliate against the Plaintiff for his lawful efforts at reporting

misconduct to appropriate officials within the DOJ, all in violation of Title 18, United States Code, Sections 1621 and 1623, *inter alia.*

63.   It was a further part of the said conspiracy that the conspirators would and did commit acts and make statements designed to conceal and cover up the conspiracy, to include the making of false statements to bar disciplinary authorities (including, *inter alia* Bar Counsel for the Florida Bar) in an effort to escape detection and sanction.

## Facts (Including Overt Conspiratorial Acts)

To advance the overall conspiracy and to affect its objects, the conspirators performed, individually and together, overt acts in the Middle District of Florida and elsewhere, including but not limited to some of the following:

64.   Between on or about October 1,1998 and June 6, 2001, Plaintiff JEFFREY J. DEL FUOCO, then an Assistant United States Attorney, investigated, indicted, convicted and sentenced six (6) members of the MCSO's "DELTA" Squad.  During this period of time, Defendant ROBERT E. O'NEILL was the direct supervisor of the Plaintiff as the Chief of the Special Prosecutions Section, and then supported and authorized Plaintiff's prosecutorial efforts, calling them "incredible", "outstanding" and of the "highest caliber", *inter alia.*

65.   On or about mid-May 2000, Defendant ROBERT E. O'NEILL (who has publicly revealed under oath the existence of a criminal investigation against former MCSO Sheriff Charles B. Wells) formally initiated said criminal investigation of Charles B. Wells and assigned the investigation to the Plaintiff.

66.   Between on or about mid-May 2000 and October 31, 2000, the Plaintiff (pursuant to Defendant ROBERT E. O'NEILL's directives) developed information and evidence

demonstrating that Charles B. Wells was then engaged in an illegal "lease-buyback" scheme with out of state banks whereby Wells was unlawfully borrowing money from said banks and wrongfully collateralizing said transactions with Manatee County-owed property and assets, including the MCSO's Motorola radio communications system, *inter alia.* This evidence was shared with Defendant ROBERT E. O'NEILL.

67.   Between on or about mid-May 2000 and October 31, 2000, the Plaintiff developed information and evidence from public records and audits demonstrating that Charles B. Wells had submitted false, fraudulent and misleading tax returns and other documentation to the U.S. Internal Revenue Service (IRS) allowing for tax exempt status of income earned by the out of state banks lending money to Charles B. Wells through the illegal "lease-buyback" scheme referenced above. This illegal activity led to the loss of hundreds of thousands of dollars in revenue, penalties and interest to the U.S. Government. This evidence was shared with Defendant ROBERT E. O'NEILL.

68.   Between on or about mid-May 2000 and October 31, 2000, Plaintiff Jeffrey J. Del Fuoco (pursuant to Defendant ROBERT E. O'NEILL's directives) continued to conduct the criminal investigation referred to herein and as a part thereof, spoke to Richard B. "Chips" Shore, the Manatee County Comptroller and Clerk of Court. As reported by the *St. Petersburg Times* on March 30, 2008, Mr. Shore provided to Plaintiff and law enforcement agents working with him evidence and copies of public audit paperwork conclusively demonstrating that Charles B. Wells was then involved in the illegal "lease-buyback" scheme with out-of-state banks referred to, *supra.* This evidence was shared with Defendant ROBERT E. O'NEILL, as was evidence that Charles B. Wells was involved in an apparent scheme to defraud the IRS, *inter alia.*

69.  Between on or about mid-May, 2000 and October 31, 2000, Plaintiff Jeffrey J. Del Fuoco provided routine updates to Defendant ROBERT E. O'NEILL on the progress of the Wells investigation, including evidence in the public domain showing that Wells had been involved in the illegal "lease-buyback" scheme referred to herein, and including information about the cooperation of Manatee County Comptroller Richard B. "Chips" Shore, who provided evidence showing that Wells had illegally collateralized approximately $8,500,000.00 in *de facto* loans through interstate bank, mail and wire transactions, *inter alia*.

70.  Between on or about mid-May, 2000 and October 31, 2000, Charles B. Wells became aware of Plaintiff's criminal investigation into his personal involvement in the "lease-buyback" and IRS schemes referred herein.  This fact has been publicly acknowledged both by Wells and by Defendant ROBERT E. O'NEILL.

71.  Between on or about mid-May 2000 and October 31, 2000, the Plaintiff (pursuant to the criminal investigation of Wells assigned to him by Defendant ROBERT E. O'NEILL) learned that contemporaneous with the "lease-buyback" scheme referred to herein, Charles B. Wells was also involved with his spouse as a real estate developer of "Foxbrook", a high-end luxury home community in Manatee County, Florida operating under the business name of "Cherokee Creek, Inc.".  This evidence was shared with Defendant ROBERT E. O'NEILL.

72.  At sometime shortly prior to September 28, 2000, Charles B. Wells sought a meeting to discuss Plaintiff's investigation with Donna A. Bucella, then the United States Attorney for the Middle District of Florida.

73.  At sometime shortly prior to September 28, 2000, Defendant ROBERT E. O'NEILL

told Plaintiff about the requested meeting by Charles B. Wells and further instructed the Plaintiff to "prepare a memo for Donna", or words to that effect, detailing the evidence developed to date concerning the criminal investigation of Charles B. Wells, and explaining why Wells might be seeking the subject meeting..

74.   Pursuant to Defendant ROBERT E. O'NEILL's directive, Plaintiff prepared the subject memo for United States Attorney Bucella (redacted copy attached hereto and incorporated herein as Exhibit B.) and gave an advance copy of the memo to Defendant ROBERT E. O'NEILL for his own information.  Plaintiff then had a lengthy, personal meeting with Defendant ROBERT E. O'NEILL prior to presenting the memo to Ms. Bucella, and discussed in detail the evidence developed to date, to include Wells' involvement in the illegal "lease-buyback" scheme, the apparent IRS fraud and the cooperation of Mr. Shore, the Manatee County Comptroller, *inter alia.*

75.   Plaintiff also discussed a certain co-conspirator of Wells with Defendant ROBERT E. O'NEILL.  Defendant ROBERT E. O'NEILL told Plaintiff that he was a "personal friend" of this individual; that the individual was a "good guy", and that he would have to "recuse himself" from further participation involving investigative decisions on this person because he "had a conflict (of interest)."   Thereafter, Plaintiff was instructed to deal with another supervisory AUSA in the office with respect to Defendant ROBERT E. O'NEILL's "friend".

76.   On or about September 28, 2000, Charles B. Wells met with United States Attorney Bucella and with Defendant ROBERT E. O'NEILL in Tampa, Florida to discuss the Plaintiff and his criminal investigation into the illegal "lease-buyback" arrangements and the apparent IRS fraud detailed herein.

77.  On or about September 28, 2000 and during the course of the subject meeting, Charles B. Wells asked Ms. Bucella to replace the Plaintiff with another Assistant United States Attorney, and told Ms. Bucella that the Plaintiff was "biased" against him and was on a *vendetta* to "ruin him and his department", or words to that effect.  Defendant ROBERT E. O'NEILL was present and participated in this meeting.

78.  On or about September 28, 2000, Ms. Bucella told Charles B. Wells that the Plaintiff was not biased, was not engaged in a *vendetta*, and that Plaintiff was only doing his job as required by his oath and as directed by her as U.S. Attorney.  Ms. Bucella told Wells that Plaintiff would stay on the case and "follow the evidence wherever it leads", or words to that effect.

79.  At sometime shortly after September 28, 2000, Ms. Bucella had a conversation with the Plaintiff and several law enforcement agents (including FDLE S/A Mark K. Flint) wherein she informed the Plaintiff and the agents that Wells was "worried" and that prior to any indictment, Plaintiff should make sure that the evidence being developed was as strong as possible to insure Wells' conviction.

80.  At sometime contemporaneous with September 28, 2000, Plaintiff was informed by members of law enforcement that Charles B. Wells had made statements that he (Wells) was "no saint"; that he was "personally responsible" for Cherokee Creek, Inc. and that he (Wells) would "get" the Plaintiff if Republican candidate George W. Bush was elected President in the November, 2000 general election.

81.  At sometime after the general election in November 2000, a controversy erupted in Palm Beach County, Florida, commonly known as the "Hanging Chad" dispute.  This dispute called into question the winner of the Presidential election, and left uncertain the

question of whether the Democrat (Vice President Al Gore) or the Republican (Governor George W. Bush of Texas) would become the next President of the United States.

82.   On several occasions between November 2000 and the resolution of the so-called "Hanging Chad" controversy, Defendant ROBERT E. O'NEILL inquired as to the status of the criminal investigation involving Wells, and told the Plaintiff that "if Bush wins, this case is history", or words to that effect.  Given the strength of the developing evidence, Plaintiff took this to mean that Republican politics would influence the future of the Wells investigation, and that any declination of prosecution would be the result of political pressure to do so. Furthermore, Defendant ROBERT E. O'NEILL continued to request updates on the developing evidence concerning his co-conspirator "friend", all despite his conflict of interest.

83.   At sometime between in or about early January 2001 and February 2001, Defendant ROBERT E. O'NEILL instructed the Plaintiff to write a "close-out" memo to the file in the investigation of Charles B. Wells and to request supervisory approval for a declination of prosecution in the case.  Defendant ROBERT E. O'NEILL told the Plaintiff that "Donna (meaning U.S. Attorney Bucella) is a 'lame duck'", and further that "Wells is untouchable", or words to that effect.  As part of the close-out, Defendant ROBERT E. O'NEILL told the Plaintiff to state in the memo that there was "insufficient evidence" to sustain a prosecution in the matter, all despite the evidence supplied by Mr. Shore, *inter alia*.

84.   Between January 2001 and sometime in 2002, Plaintiff continued the investigation of Charles B. Wells and the co-conspirator "friend", all despite Defendant ROBERT E. O'NEILL's directive that he close the investigation.  Defendant ROBERT E. O'NEILL

made several inquiries about the closing of the case, and Plaintiff told him that he was "working on it", or words to that effect. Thereafter, Plaintiff heard nothing else from Defendant ROBERT E. O'NEILL or anyone else about the matter until sometime in mid-March, 2002. In the meantime, Plaintiff continued to investigate and analyze the case involving Charles B. Wells with the help of an agent of the FDLE and with input from the IRS.

85. On or about February 3, 2001, Defendant ROBERT E. O'NEILL wrote a glowing personnel evaluation of the Plaintiff's performance as an Assistant United States Attorney, and made specific comments about the Plaintiff's investigation of the MCSO. According to Defendant ROBERT E. O'NEILL's evaluation of the Plaintiff, in a "series of public corruption cases involving the Manatee County Sheriff's Office, Mr. Del Fuoco was able to demonstrate the legitimacy of the investigation and the fact that the *corruption was rampant*." (Emphasis supplied). In the same document, Defendant ROBERT E. O'NEILL wrote, *inter alia,* that "Mr. Del Fuoco is as good as anyone in identifying, developing and structuring investigations. He has an incredible talent . . . his perseverance and determination have been incredible" and further, that "(p)ractically everything that he has attempted has proven successful."

86. Shortly after Defendant ROBERT E. O'NEILL's glowing evaluation of the Plaintiff, Plaintiff was bestowed with the "Director's Award" from the Executive Office of United States Attorneys, U.S. Department of Justice for "Superior Performance as an Assistant United States Attorney."

87. On or about March 18, 2002, Defendant PAUL I. PEREZ was confirmed by the U.S. Senate as the United States Attorney for the Middle District of Florida. Defendant PAUL

I. PEREZ then selected Defendant JAMES R. KLINDT as his First Assistant United States Attorney, and appointed Defendant ROBERT E. O'NEILL as the Chief of the Criminal Division.

88.   Shortly after on or about March 18, 2002, Plaintiff was called to the office of Defendant JAMES R. KLINDT for a meeting on the investigation of Charles B. Wells. During this meeting, Defendant KLINDT informed Plaintiff that "'Paul' (meaning Defendant PAUL I. PEREZ) has to meet with Charlie Wells, and the subject is YOU", or words to that effect. Defendant KLINDT requested a status update on the Wells investigation, and told the Plaintiff, "you know that 'Charlie' *hates your guts* ", right?" "Why does 'Charlie' hate you so much?", or words to that effect. Thereafter, Plaintiff told Klindt, "for doing my job", meaning Plaintiff's lawful investigative efforts. Klindt then told Plaintiff he'd "get back" to him "once 'Paul' meets with 'Charlie'", or words to that effect.

89.   At sometime in or about the end of March 2002, AUSA John Doe #1 became Plaintiff's supervisor in the so-called and short-lived "Public Corruption Section". During this period of time, Plaintiff had several "proffer" meetings and telephone talks with the prominent and nationally known criminal defense attorney representing Defendant ROBERT E. O'NEILL's "friend" (*See, supra*).   These meetings were held in an attempt to garner the cooperation of Defendant ROBERT E. O'NEILL's "friend", who was reported to be a close associate with Wells and others, and who threatened that, "if I go down, Charlie's going down with me", or words to that effect. At the time, Defendant ROBERT E. O'NEILL was still officially recused from any involvement concerning this "friend".

90.   On at least one or more occasions sometime during the end of March 2002 and thereafter, Defendant ROBERT E. O'NEILL continued to inquire as to the status of his "friend", all despite the fact that another supervisory AUSA was named to replace him in the decision making process.   During this period of time, Defendant ROBERT E. O'NEILL approached the Plaintiff and told him that his "friend" was a "good guy" and thus should not be charged.   According to Defendant ROBERT E. O'NEILL, his "friend" did "nothing wrong" and deserved to be "cut loose", or words to that effect.   Plaintiff ignored such comments and went about his investigative business, reporting to Mr. Doe #1 that Defendant ROBERT E. O'NEILL was earlier recused from any involvement concerning the "friend".

91.   Unbeknownst to the Plaintiff, Defendant ROBERT E. O'NEILL was having unauthorized and improper discussions with the prominent and nationally known criminal defense attorney referred to, *supra* concerning his "friend's" case, and was assuring this lawyer that he would "take care of" the matter or words to that effect.   Apparently, Defendant ROBERT E. O'NEILL never revealed to this lawyer that he was formally recused from any further involvement.

92.   At sometime between on or about March 18, 2002 and on or about October 2002, and in violation of his stated "recusal" on the matter involving the "friend", Defendant ROBERT E. O'NEILL had one or more direct conversations with his "friend" and told his friend" that the "investigation is over", or words to that effect.

93.   At sometime during on or about October 2002 and thereafter, the prominent and nationally known Tampa criminal defense attorney representing the "friend" called Plaintiff directly and informed him that "Bobby" (meaning Defendant ROBERT E.

O'NEILL) had directly called his client to personally tell him that "the investigation is over", or words to that effect. Mr. Doe #1 received one or more similar phone calls from the prominent and nationally known Tampa criminal defense attorney.

94.   On several occasions between on or about March 18, 2002 and August of 2003 and thereafter, Defendants PAUL I. PEREZ and JAMES R. KLINDT personally met with Sheriff Charles B. Wells and asked Wells "what they could do for him", or words to that effect. Wells told Defendants PAUL I. PEREZ and JAMES R. KLINDT that they could "*closely' supervise' Del Fuoco*", among other discussions about the Plaintiff.

95.   During one of their meetings with Charles B. Wells held in Manatee County, Florida, Defendants PAUL I. PEREZ and JAMES R. KLINDT discussed the status and facts of several criminal investigations initiated by the Plaintiff, some involving close relatives and associates of Charles B. Wells, including his former sister-in-law, his brother-in-law and the "friend" of Defendant ROBERT E. O'NEILL referred to herein. Among other things, Defendant ROBERT E. O'NEILL's "friend" was alleged to have stolen $750,000.00 from the scene of a narcotics search warrant  As noted, this "friend" of Defendant ROBERT E. O'NEILL's was also an employee of  and a close personal associate of Charles B. Wells.

96.   At sometime between on or about July 1, 2002 and August 2002, Plaintiff had a meeting with Defendant ROBERT E. O'NEILL, AUSA Robert Mosakowski and Mr. Doe#1 concerning public corruption investigations being conducted by the Plaintiff (including that of his "friend"), and the Plant City Police Department (PCPD), *inter alia*. During this meeting, Defendant ROBERT E. O'NEILL threatened the Plaintiff and told the Plaintiff that *"people in 'this town'* (Tampa) *will 'get you'"*. Plaintiff took this to

mean that both Wells and the prominent and nationally known Tampa criminal defense attorney representing his "friend" were among the people being referred to, *inter alia.* During this meeting, AUSA Robert Mosakowski told Plaintiff that if he "*didn't 'watch himself'*", he'd be "*prosecuting immigration cases.*"

97. In July of 2002, Plaintiff tried and convicted before a jury Armand T. Cotnoir, a corrupt member of the PCPD on 8 federal felony counts, including civil rights violations, mail fraud and obstruction of justice, *inter alia.*

98. During the months leading up to the Cotnoir trial, Defendant ROBERT E. O'NEILL unlawfully interfered with the investigation of the PCPD and the Plaintiff's role in it, all at the apparent behest of Defendants PAUL I PEREZ and JAMES R. KLINDT, and all for apparent political reasons. During this period of time, Defendant ROBERT E. O'NEILL (with the apparent approval of Defendants PAUL I. PEREZ and JAMES R. KLINDT) was unlawfully meeting with defense attorneys for the subjects of Plaintiff's ongoing investigation of the PCPD, including two local Tampa attorneys representing the mayor of Plant City (who was paying everyone's legal bills) and certain co-conspirators.

99. At various times between at least on or about July 2002 and August 2002, Defendant ROBERT E. O'NEILL met with these defense attorneys, who were looking to "dig up dirt" on the Plaintiff in order to get the Plaintiff removed from the ongoing investigation of the PCPD. According to a sworn affidavit by convicted police officer Armand T. Cotnoir, the "game plan" was for the Plaintiff to be removed from the investigation of the PCPD in order to "shut it down" and prevent further investigations and convictions. According to Cotnoir, removal of the Plaintiff from the investigation would be the "silver

bullet" that would "stop the investigation in its tracks".   A complete copy of Cotnoir's

sworn affidavit is attached hereto and incorporated herein as Exhibit C.

100.   The meetings between Defendant ROBERT E. O'NEILL and the defense attorneys

attempting to stop Plaintiff's investigation "in its tracks" were being held at a bar in

Tampa, Florida known as *Four Green Fields*, which is owned by Defendant ROBERT E.

O'NEILL.  These improper meetings and conversations were being conducted during the

Plaintiff's honest prosecutorial efforts in investigating  the corrupt affairs of the PCPD,

and according to Cotnoir, included the unauthorized release of information on the status

of the Plaintiff's investigation of the PCPD to the subject lawyers, along with assurances

that no further investigations would go forward, and that the Plaintiff would in fact be

removed from further investigation of the PCPD, the mayor or any other official.

101.   The unlawful tampering with the Plaintiff's criminal investigation of the PCPD

was done by Defendant ROBERT E. O'NEILL for purely political reasons, and included

an apparent desire by Defendant PAUL I. PEREZ (who wanted an appointment as a

Federal Judge) to appease certain local politicians, including some who figuratively

equated Plaintiff's investigation to terrorism by "flying an airplane into (Plant) City

Hall", or words to that effect.

102.   On or about September 23, 2002, Plaintiff sent an e-mail in good faith to Defendant

PAUL I. PEREZ informing him that Defendant ROBERT E. O'NEILL had an actual

conflict of interest in the investigation of the PCPD.  This e-mail informed Defendant

PAUL I. PEREZ that Defendant ROBERT E. O'NEILL had "substantial and continuing

contacts" with defense attorneys in the PCPD investigation and that the said attorneys

were attempting to "smear" Plaintiff's reputation and "have (him) removed as the

prosecutor on the case." Plaintiff's e-mail further told PEREZ of concern for his family, and that "several instances of wrongful surveillance and invasion(s) of privacy (to include drivers license runs and possible FCIC/NCIC checks)" had taken place which were then thought to have been the work of the PCPD and the lawyers commiserating with Defendant ROBERT E. O'NEILL. This e-mail specifically told PEREZ that Plaintiff was "fearful of the potential for reprisal activity" and that such activity "ha(d) now begun in earnest", all as a result of Defendant ROBERT E. O'NEILL's association with the defense attorneys originally conspiring with Armand Cotnoir to "dig up dirt" on the Plaintiff. Defendant JAMES R. KLINDT was a recipient of a copy of this e-mail. A complete copy of the Plaintiff's e-mail (which constituted a "whistleblower"complaint under Federal law) is attached hereto an incorporated herein by reference as <u>Exhibit D.</u>

103.   On or about mid-October 2002 (and despite 3 convictions to date of corrupt officers in the PCPD on federal corruption charges) Defendant PAUL I. PEREZ wrongfully removed the Plaintiff from the ongoing investigation of the PCPD, all in retaliation and reprisal for reporting Defendant ROBERT E. O'NEILL's misconduct as noted herein, and for political reasons because Plaintiff was making too many "waves". In addition, Defendant PAUL I. PEREZ stripped the Plaintiff of all corruption investigations then being handled by him and unlawfully reassigned him to another section of the office. During this period of time, Defendant ROBERT E. O'NEILL warned others AUSAs in the office that "things are gonna get bad for Del Fuoco", and that "Jeff 'rolled the bones' and lost", or words to that effect.

104.   On or about mid-October 2002, Defendant ROBERT E. O'NEILL (acting at the behest of Defendants PAUL I. PEREZ and JAMES R. KLINDT) directed reassignment

of all of the Plaintiff's public corruption cases and investigations to others. Specifically, the case of Armand T. Cotnoir (who had not yet been sentenced) was reassigned to Mr. Doe #1, as was the overall investigation, which for all intents and purposes, was over. Contemporaneously, the local Tampa media reported that the Plant City mayor was "cheering" the Plaintiff's transfer, and that the mayor was calling Plaintiff's honest prosecutorial efforts an "abuse of power." Furthermore, then Mayor Mike Sparkman told a certain witness that he had been assured by "insiders" that the investigation was to be "killed" and that "with Del Fuoco finally gone, the investigation is over" and "there will be no further investigations" , or words to that effect.

105.  In September 2002, neighbors in Plaintiff's community reported to Plaintiff's wife that a suspicious looking vehicle had been observed "casing" Plaintiff's neighborhood and sitting outside his home in apparent surveillance activity. According to neighbors, the individual driving this vehicle flashed law enforcement credentials and claimed to be a "private investigator" with a right to be there. Thereafter, the Florida Department of Law Enforcement (FDLE) followed up on these sightings and learned conclusively that members of the MCSO (to include Charles B. Wells' brother-in-law, *inter alia*) were responsible for conducting illegal computer runs (all in violation of Federal law) of Florida DMV, FCIC and NCIC databases in search of the personal information about Plaintiff and the Plaintiff's ex-wife, with whom his minor son resided.  The FDLE concluded that Plaintiff and his family were in physical danger from members of the MCSO, all in retaliation for the Plaintiff's successful prosecution of the MCSO members and his investigation into the illegal, *de facto* bank loans and IRS fraud perpetrated by Sheriff Charles B. Wells.

106.  After learning of the above, Plaintiff took his concerns to  management (including to Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT) and asked for an investigation and for protection for Plaintiff and his family.  Thereafter, it was suggested to Plaintiff by persons with knowledge (including John Doe #1) that nothing would be done to protect him and his family because of the Republican political connections of Charles  B. Wells and his friendship with the Bush Administration.

107.  In earl January 2003 when Plaintiff learned that the management of the U.S. Attorney's Office would take no action to protect him and his family, the Plaintiff filed a lawsuit in the U.S. District Court for the Middle District of Florida against Wells and others in the MCSO.  This lawsuit, captioned *Del Fuoco v. Wells, et al.* alleged violations of the "Drivers' Privacy Protection Act" (18 U.S.C. Section 2721, *et seq.*) and was brought with the intent of protecting Plaintiff's family from the clearly retaliatory and dangerous acts of Wells, his brother-in-law and others in the MCSO.

108.   Shortly after filing the lawsuit, Plaintiff was contacted by Sergeant Joseph Burnhart of the MCSO, who informed Plaintiff that he and his family were in grave danger, and that associates of Wells were responsible for running his tags through the NCIC and the FCIC as well as his ex-wife's tags, all in an effort to track and locate Plaintiff and his family in order to retaliate against them.  Sergeant Burnhart related to Plaintiff that Wells' brother-in-law (Larry Bahnsen) would "shoot somebody in the fuckin' head" to keep from being discovered and that Bahnsen had uttered direct threats to him about "*going after Del Fuoco's family.*"  According to Sergeant Burnhart, Bahnsen told him, "when you want to '*get*' somebody, you don't go after them, *you go after their family*", or words to that effect.

109.  Upon receipt of the information supplied by Sergeant Burnhart, Plaintiff relayed the information to management within the U.S. Attorney's Office (including to AUSA John Doe #1 and to Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT) and asked for a criminal investigation and for protection for him and his family.  Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT refused to provided any such assistance, and continued to play "politics" for the benefit of Charles B. Wells, all for the apparent purpose of currying Republican political favor in support of Defendant PAUL I. PEREZ's bid to be a Federal Judge, *inter alia.*

110.  On or about May 16, 2003, Armand T. Cotnoir appeared for sentencing before the Honorable Richard A. Lazzara, U.S. District Judge, and received a 30 month jail term. Mr. Doe #1 represented the Government at this sentencing.  During sentencing, Cotnoir was given time to report, and did not go into immediate custody, instead being required to report in August, 2003 .

111.  On or about May 16, 2003,  the Plaintiff was unlawfully transferred to the Civil Division of the U.S. Attorney's Office by Defendants PAUL I. PEREZ and JAMES R. KLINDT, a personnel action taken in retaliation for his filing of the lawsuit against Wells and the MCSO, and for speaking publicly about it in an effort to protect his family.  On the same day, Defendant JAMES R. KLINDT met with the Plaintiff in Jacksonville, Florida to tell him of the transfer, and to discuss his public statements about the matter to the media.  This retaliatory action was taken despite the fact that Plaintiff's counsel had informed Defendants PEREZ and KLINDT two weeks earlier of the planned public statements, and to request help and protection for the Plaintiff and his family.

112.   The Plaintiff's transfer to the Civil Division was undertaken with the specific purpose of forcing the Plaintiff's resignation from the office, and to interfere with the civil case against Wells and others.   In this regard, it was a well-known, unwritten and unlawful "policy" to transfer AUSAs from the Criminal Division to the Civil Division if they refused to go along with illegal management *agendas, inter alia.*   In this regard, the Civil Division was viewed by Defendants PAUL I. PEREZ and JAMES R. KLINDT as a "dumping ground" for such personnel, all despite its importance to the United States and the mission of the Office.

113   Between on or about May 16, 2003 and August 13, 2003, Defendant ROBERT E. O'NEILL along with another co-conspirator unlawfully attempted to pressure Mr. Doe #1 into filing a sentencing reduction motion for Armand T. Cotnoir under Rule 35 of the Federal Rules of Criminal Procedure.   This pressure was being exerted on Mr. Doe#1 by Defendant ROBERT E. O'NEILL as an apparent "favor" to certain criminal defense attorneys working on behalf of the PCPD subjects in that investigation, and at the behest of Defendants PAUL I. PEREZ and JAMES R. KLINDT.   The effort to put pressure on Mr. Doe#1 to file such an unwarranted reduction would have insured that Armand T. Cotnoir did little to no jail time as a result for his conviction on 8 serious Federal felonies.   Mr. Doe#1 refused (in writing) to file such a motion because Cotnoir had not earned such a reduction.

114.   On or about August 8, 2003 (during a period of time when Mr. Doe #1 was on annual leave), AUSA Robert Mosakowski (on orders from Defendant ROBERT E. O'NEILL) petitioned the Court for an order on behalf of Cotnoir extending the time

which he was to report to prison. Based upon information and belief, the "reason" for requesting this delay was Cotnoir's alleged ongoing cooperation, which was false.

115. On or about August 15, 2003, (subsequent to Mr. Doe #1's refusal to file the sentencing reduction motion for Armand T. Cotnoir), Defendant ROBERT E. O'NEILL and AUSA Robert Mosakowski (working at O'NEILL"s direction) took the Cotnoir case away from Mr. Doe #1; and directed a sentencing reduction for Cotnoir through another AUSA. This was done despite the fact that Armand T. Cotnoir had implicated the said ROBERT E. O'NEILL in the unlawful dissemination of investigative information on the PCPD case at his bar, *Four Green Fields*, and all as outlined in the attached Affidavit of the said Armand T. Cotnoir and elsewhere.

116. The involvement of Defendant ROBERT E. O'NEILL in directing a sentencing reduction for Armand T. Cotnoir was improper, presented the appearance of impropriety, and constituted a conflict of interest on the part of Defendant ROBERT E. O'NEILL, *inter alia*. In this regard, Cotnoir had implicated Defendant ROBERT E. O'NEILL in potential criminal misconduct, and Defendant ROBERT E. O'NEILL well knew and believed this.

117. On August 29, 2003, and at numerous times thereafter, Plaintiff JEFFREY J. DEL FUOCO reported Defendant ROBERT E. O'NEILL's misconduct (all as stated herein) to the DOJ Office of Professional Responsibility (OPR), and the Attorney General of the United States, all as required by law and DOJ regulation. Defendant ROBERT E. O'NEILL was shortly thereafter told about these OPR and other reports by Defendants PAUL I. PEREZ and JAMES R. KLINDT. These reports caused Defendant ROBERT E. O'NEILL to have admitted *"tremendous animosity"* toward the Plaintiff.

118. On October 8, 2003, Defendant JAMES R. KLINDT met with Special Agents of the FDLE to discuss issues surrounding the criminal investigations of certain associates of Charles B. Wells, including certain relatives of his and the "friend" of Defendant ROBERT E. O'NEILL, who was suspected of stealing $750,000.00 from a drug dealer. During this meeting, Defendant JAMES R. KLINDT admitted to the FDLE agents that he and Defendant PAUL I. PEREZ had personally met two months earlier with Charles B. Wells to discuss "unspecified issues" "relating to AUSA Jeff Del Fuoco." Thereafter, Defendant KLINDT refused to specify what was said about the Plaintiff to Charles B. Wells, except that "the allegations" needed to be resolved.

119. On or about October 15, 2003, Defendant JAMES R. KLINDT met again with S/As of the FDLE and was provided with copies of FDLE's confidential investigative reports relating to these issues, including the issues surrounding FDLE's concerns for the physical safety of the Plaintiff and his family.

120. On or about October 30, 2003, Defendant JAMES R. KLINDT had a 3rd meeting with S/A Mark K. Flint and another special agent of the FDLE. FDLE's purpose in requesting this meeting was to discuss the investigation of Charles B. Wells, as well as facts proving that Wells and other associates within the MCSO were responsible for illegally running the Plaintiff's tags, his ex-wife's tags and for surveilling the home of the Plaintiff, all in an obvious effort to do harm to the Plaintiff and his family. The meeting was needed in order for FDLE to determine which way to proceed, since the U.S. Attorney's Office had lent no support whatsoever to date in helping to assist the FDLE with the matter.

121. During the course of this meeting described above, Defendant JAMES R. KLINDT told S/A Flint that he had conferred with Defendant PAUL I. PEREZ concerning the allegations against Charles B. Wells. Defendant KLINDT then told S/A Flint that as far as the investigation of Wells was concerned, "'*he' (Wells) swings a big bat or a big 'stick', and there will be no further investigations targeting Wells*", or words to that effect (Emphasis added). S/A Flint took this to mean that there would be no further investigations of Wells because he had "*considerable political influence*" with the Republican Party, and with the administrations of both Governor Jeb Bush in Florida (named by S/A Flint in an Affidavit) and that of President George W. Bush in Washington. A complete copy of an Affidavit executed by S/A Flint for the U.S. Senate Judiciary Committee is attached hereto and incorporated herein by reference as Exhibit E.

122. With regard to the comments about Wells "swinging a 'big political stick'", Defendant JAMES R. KLINDT has unlawfully attempted to conceal his involvement in the instant conspiracy by making false official statements to Bar Counsel for the Florida Bar concerning the matters reported under oath by S/A Flint, claiming that S/A Flint's affidavit is untrue, all in Florida Bar Case No. 2009-00,424(4B), a public record.

123. In on or about mid-January, 2004, Plaintiff filed a complaint with the U.S. Office of Special Counsel (OSC) against Defendants ROBERT E. O'NEILL, PAUL I. PEREZ, JAMES R. KLINDT and others detailing the retaliation against him for his whistleblowing activity in reporting the misconduct set forth herein. Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT were made aware of this complaint to the OSC shortly after its filing.

40

124.  On or about March 4, 2004, Plaintiff reported to the DOJ the possible theft of more than $800,000.00 in DEA "Equitable Sharing" funds seized from drug dealers.  Plaintiff's report implicated Defendants JAMES R. KLINDT and PAUL I. PEREZ in retaliating against AUSA John Doe #3 for bringing this possible theft to light.

125.  With regard to the possible theft, Mr. Doe #3 told the Plaintiff that he had been retaliated against and removed as a section chief by Defendants JAMES R. KLINDT and PAUL I. PEREZ because Defendant KLINDT did not want to "make waves" with the DEA, where his wife worked as a supervisor.  Both Defendants PAUL I. PEREZ and JAMES R. KLINDT were aware of Plaintiff's report about the possible theft of this money and the retaliation against John Doe #3 to the DOJ.

126.  On or about April 26, 2004, Plaintiff's then-Washington counsel, Stephen M. Kohn, Esquire wrote directly to Attorney General John Ashcroft to inform him of the misconduct described herein and to request assistance for Plaintiff and his family.  Defendants ROBERT E. O'NEILL, PAUL I. PEREZ, JAMES R. KLINDT and AUSA Robert Mosakowski were copied on this correspondence, and received those copies the same day.  In that letter, Mr. Kohn told the Attorney General, *inter alia* that death threats had been made to the Plaintiff and his family; that Plaintiff and his family had been stalked by members of the MCSO, and that Plaintiff had suffered "retaliatory, on-the-job harassment after . . . undert(aking) reasonable and lawful steps to protect himself and his family."  The Attorney General was then told that the "DOJ ignored the situation, and refused to intervene and protect (Plaintiff) from the death threats and privacy violations" demonstrably committed by Wells and the MCSO.  A complete copy of Mr. Kohn's letter to Attorney General Ashcroft is attached hereto and incorporated herein As <u>Exhibit F.</u>

127.   Subsequent to Mr. Kohn's letter to Attorney General Ashcroft, Plaintiff continued to be harassed and unlawfully retaliated against on the job, and in fact, began to be treated worse than he had before, all in retaliation for Mr. Kohn's letter to the Attorney General.  At this point, Plaintiff had been transferred to the Civil Division of the office, and was beginning to feel pressure from co-conspirator Warren E. Zimmerman, the Chief of the Civil Division and Plaintiff's new superior there, who told Plaintiff he "wouldn't be getting away with anything else" in the Civil Division.

128.   On or about May 5, 2004, Mr. Doe #1 was summoned to a meeting with Defendant PAUL I. PEREZ and AUSA Robert Mosakowski, and told that he was not viewed as a "'team player'", " because of everything that has happened with Del Fuoco", who had "paralyzed" Defendant PEREZ, or words to that effect.  As a result of not being viewed as a "team player",  Mr. Doe #1 was told by Defendant PAUL I. PEREZ that adverse personnel action would be taken against him.  At that, Defendant PAUL I. PEREZ informed Mr. Doe #1 that he would not be getting an already promised promotion as a Senior Litigation Counsel (SLC), and that he would lose approximately $5,000.00 in salary that he was then receiving as a result.  During this meeting, Mr. Doe #1 was also stripped of other employment privileges, and was told by Defendant PAUL I. PEREZ that he was being reassigned because of "everything that has happened with Del Fuoco" and "because of the 'thing' with Cotnoir" (a reference to the Plaintiff's "whistleblower" complaints involving PCPD Officer Armand T. Cotnoir).  This unlawful personnel action was taken by Defendant PEREZ against Mr. Doe #1 in a vicarious attempt to retaliate against the Plaintiff, and because of Mr. Doe #1's refusal to follow Defendant ROBERT E. O'NEILL's unlawful directive to lie to the Court in order to secure a sentencing

reduction for Armand T. Cotnoir. This unlawful and disgraceful action was also taken

because of Mr. Doe #1's support for the honest prosecutorial efforts of the Plaintiff in the

MCSO case and in the PCPD case, and for his attempts to investigate the threats made to

Plaintiff and his family.

129   Shortly after on or about May 5, 2004, Mr. Doe #1 in fact suffered the unlawful

personnel actions detailed *supra*, all in a clear effort by Defendant PAUL I. PEREZ to

vicariously retaliate against the Plaintiff, who he felt had "paralyzed" him. Mr. Doe #1's

pay was reduced, he lost certain privileges, his office and the promised appointment as an

SLC.

130.   Between on or about the summer of 2004 through and including April 2005, the

Plaintiff began to suffer more and more retaliatory *animus* from co-conspirator Warren

A. Zimmerman, his immediate supervisor in the Civil Division. Among other things, Mr.

Zimmerman routinely and unnecessarily monitored the Plaintiff's whereabouts at all

times, conducted "spot checks" on what the Plaintiff was working on, and otherwise

appeared to be trying to "catch" Plaintiff in some type of misconduct (*i.e.*, a "gotcha"

moment) all in an obvious effort to begin building a "case" against him. By way of

example, Mr. Zimmerman monitored the use of Plaintiff's phone privileges, and began to

forbid Plaintiff from talking on the phone about outside sports and recreation activities,

including amateur baseball and coaching his son's Little League baseball team, *inter alia*.

In this regard, it became clear that Mr. Zimmerman was being directed by higher

management to harass Plaintiff, including the questioning of Plaintiff's military duties.

131.   On several occasions, co-conspirator Zimmerman told Plaintiff (a veteran Federal

prosecutor and a U.S. Army Reserve Colonel) that he would "not be getting away with

anything like he did in 'criminal'" and that he would not be "getting over" like he did "in

criminal." Given Plaintiff's record of proven competency and success in the Criminal

Division prior to the misconduct of Defendants ROBERT E. O'NEILL, PAUL I. PEREZ

and JAMES R. KLINDT, Plaintiff took such comments to mean that he was subject to

additional, ongoing retaliation for his honest efforts and his failure to play political

"games" with Wells, the PCPD and others.

132.   On or about April 4, 2005, co-conspirator Zimmerman confronted Plaintiff in the

lunch room on the 30th Floor of the U.S. Attorney's Office in Tampa and asked Plaintiff

whether he knew that the "Pope had died", or words to that effect.  When Plaintiff

responded in the affirmative, co-conspirator Zimmerman asked Plaintiff if he was "going

to *apply to be the (next) Pope*?"  When Plaintiff asked Zimmerman what he was talking

about, Zimmerman responded that in Plaintiff's "*next job*", Plaintiff could "become the

Pope", given his status as an "*Italian Catholic* from Philadelphia."  This made Plaintiff

extremely uncomfortable, and indicated to Plaintiff that co-conspirator Zimmerman was

sending him a not-so-subtle message that he would no longer be working as an Assistant

United States Attorney.  In this regard, Zimmerman (who is believed to be Jewish), said,

"*they're gonna need somebody to be the Pope, and you'd be perfect for the job.  You'd*

*'fit the bill'.  You're Italian, you're a Catholic and your from Philadelphia"*, or words to

that effect.  Approximately one week later, Zimmerman made other improper comments

about Plaintiff and U.S. District Judge Elizabeth A. Kovachevich (apparently also a

Catholic), remarking that Plaintiff and Judge Kovachevich would make a "*good team*" in

"*running the Vatican*", or words to that effect.

133.   On or about April 6, 2005, the Plaintiff made a pre-complaint of Mr. Zimmerman's improper and outrageous comments to the EEO Staff at the Executive Office for United States Attorneys (EOUSA) at DOJ Headquarters in Washington, D.C.   A complete copy of Plaintiff's report is attached hereto and incorporated herein as Exhibit G.   Plaintiff learned that members of management, including co-conspirators Zimmerman, Defendant JAMES R. KLINDT and Defendant PAUL I. PEREZ, were contemporaneously apprised of and were aware of Plaintiff's complaint to EOUSA, and had been interviewed by EEO personnel.

134.   At sometime during the week of June 13, 2005, Defendant ROBERT E. O'NEILL visited the office of AUSA Jeffrey S. Downing during business hours of the Federal work day.   This visit occurred inside the U.S. Attorney's Office building in Tampa, Florida. During this visit with Mr. Downing (pretextually meant to discuss DOJ business with Mr. Downing), Defendant ROBERT E. O'NEILL told Mr. Downing to tell the Plaintiff that he would *"whip his motherfucking ass in whatever county he chose"*,  or words to that effect.  Defendant ROBERT E. O'NEILL further told Mr. Downing that he *"knows that the message will get to Del Fuoco because you two are 'buddies'"*, or words to that effect.  Defendant ROBERT E. O'NEILL further told Mr. Downing to tell the Plaintiff that *"I'm from the Bronx, and this is the way we settle things where I'm from"*, or words to that effect.  Mr. Downing then told Defendant ROBERT E. O'NEILL that he felt very uncomfortable being the messenger of such threats, and that he did not want to be involved in any manner with such a scenario, which could constitute a felony under the law.  Defendant ROBERT E. O'NEILL then pressed on with such threats, and told Mr. Downing to *"make sure"* the message of an *"ass-whipping"* got back to the Plaintiff.

Shortly thereafter, Mr. Downing made the Plaintiff aware of the threats by Defendant ROBERT E. O'NEILL.   At the time of these threats, Mr. Downing was a subordinate of Defendant ROBERT E. O'NEILL and was senior rated in personnel matters by Defendant ROBERT E. O'NEILL.  Plaintiff was not supervised by Defendant ROBERT E. O'NEILL at the time.

135.  At sometime during the week of June 13, 2005, Defendant ROBERT E. O'NEILL visited the office of AUSA Ernest F. Peluso during business hours of the Federal work day.  This visit occurred in Mr. Peluso's Office inside the U.S. Attorney's Office in Tampa, Florida.  During this visit (again on the pretext of discussing DOJ business with Mr. Peluso) Defendant ROBERT E. O'NEILL berated the Plaintiff to Mr. Peluso, and told Mr. Peluso (whom Defendant ROBERT E. O'NEILL knew to be a long-time acquaintance of the Plaintiff) that he would *"whip Del Fuoco's motherfucking ass"*; *"kick Del Fuoco's motherfucking ass"* or words to that effect.  Mr. Peluso then told Defendant ROBERT E. O'NEILL that he couldn't be serious, to which Defendant ROBERT E. O'NEILL reiterated that he was in fact "dead serious" about *"whipping Del Fuoco's ass"* and otherwise causing bodily injury to the Plaintiff.  Thereafter, Mr. Peluso relayed the threats made by Mr. O'Neill to the Plaintiff.  At the time of the threats, Mr. Peluso (like Mr. Downing) was a subordinate of Defendant ROBERT E. O'NEILL's, and was senior rated in personnel matters by Defendant ROBERT E. O'NEILL.  Plaintiff was not supervised by Defendant ROBERT E. O'NEILL at the time.

136.  At sometime during the week of June 13, 2005, Defendant ROBERT E. O'NEILL had one or more visits with AUSA Robert Mosakowski (the Chief of the Tampa Criminal Division) during the Federal work day, and similarly, based upon information and belief,

46

made comments to AUSA Mosakowski about "whipping the Plaintiff's ass", *inter alia.* These visits occurred in the Office of the U.S. Attorney in Tampa, Florida. Mr. Mosakowski was a direct subordinate of Defendant ROBERT E. O'NEILL, and was directly rated by Defendant ROBERT E. O'NEILL in personnel matters.

137. On or about June 17, 2005, Plaintiff was on sick leave and was returning home from a doctor visit when he received a cell phone call from Defendant JAMES R. KLINDT. During this call, Defendant JAMES R. KLINDT informed the Plaintiff that he was no longer allowed to enter the U.S. Attorney's Office without an escort, all because Defendant PAUL I. PEREZ had determined that he should be placed on a "work-at-home" schedule. According to Defendant JAMES R. KLINDT, this personnel action was being taken for "security" reasons.

138. Defendant JAMES R. KLINDT told the Plaintiff that until further notice, he was to work "full-time" from home, and take his assignments directly from co-conspirator Zimmerman by telephone. When Plaintiff inquired as to what this was all about, Defendant JAMES R. KLINDT (who had been interviewed shortly before by an EEO Counselor about Plaintiff's report and EEO filing against Warren A. Zimmerman) stated that he would "get back" to Plaintiff later that day and hung up the telephone.

139. Several hours after returning home from the doctor's office on June 17, 2005, a courier was sent to Plaintiff's home in Tarpon Springs, Florida by Defendant JAMES R. KLINDT. The courier collected the Plaintiff's DOJ credentials and office access card from the Plaintiff, and then served the Plaintiff with a large, sealed manila envelope with the words "CONFIDENTIAL" stamped conspicuously in various places upon it. The seal on the envelope bore Defendant JAMES R. KLINDT's initials, "JRK" at several

places on the seal.  Inside this envelope was a smaller, sealed manila envelope which also

had the words "CONFIDENTIAL" stamped conspicuously in various places upon it.

Both items were addressed to the Plaintiff in his capacity as an Assistant United States

Attorney.

140.   Inside the second manila envelope was a letter addressed to the Plaintiff from

Defendant PAUL I. PEREZ.  This letter was marked **"PRIVACY ACT SENSITIVE"**

and detailed to Plaintiff "that as of June 17, 2005", Plaintiff would be "placed on a work-

at-home schedule" pending a "decision" on a "proposed removal action" from Federal

employment.  Defendant PAUL I. PEREZ warned Plaintiff in the letter that should

"AUSA Zimmerman attempt to contact you at your home at any time . . .and is unable to

do so, you will be charged with Absence Without Leave (AWOL).  You are warned that

AWOL is serious misconduct which may result in disciplinary action being taken against

you."  Given that the Privacy Act of 1974 (5 USC 552a) has already been repeatedly,

willfully and maliciously violated by Defendant ROBERT E. O'NEILL and other co-

conspirators in this cause, a complete copy of Defendant PEREZ's letter is attached

hereto and incorporated herein as Exhibit H.

141.   During the afternoon of June 17, 2005, Defendant ROBERT E. O'NEILL, AUSA

Robert Mosakowski and other co-conspirators began telling colleagues of the Plaintiff

that the Plaintiff was being "fired" and that the Plaintiff was "no longer allowed in the

building without an escort."  According to Defendant ROBERT E. O'NEILL and AUSA

Mosakowski, employees were to immediately report any sightings of the Plaintiff in the

building that houses the U.S. Attorney's Office.

142.   On or about June 21, 2005, the *St. Petersburg Times* ran a headline article captioned "CONTROVERSIAL FEDERAL PROSECUTOR LOSES JOB", reporting falsely that the Plaintiff had been "fired" from his job as an Assistant United States Attorney.   When the Plaintiff called reporter Candace Rondeaux with an immediate demand for a retraction, Ms. Rondeaux told the Plaintiff that an "absolutely unimpeachable source" who was a *"member of management"* in the U.S. Attorney's Office in Tampa had relayed that Plaintiff had been *"fired"* and was no longer working as an AUSA.   Based upon information and belief, this "absolutely unimpeachable source" was Defendant ROBERT E. O'NEILL.

143.   On or about June 21, 2005, the *Tampa Tribune* called the Plaintiff on the telephone at home.   Plaintiff then spoke with reporters Elaine Silvestrini (the Federal Courts reporter for the *Tribune*) and Len Savino, another *Tribune* reporter working with Ms. Silvestrini.   After inquiring about the Plaintiff's alleged *"firing"* and being told that such reports were false, Mr. Savino told the Plaintiff that he "could never get a 'straight answer' out of (Defendant Robert E.) O'NEILL", relating to the Plaintiff that Defendant ROBERT E. O'NEILL was the source of information to the *Tribune* falsely stating that the Plaintiff had been *"fired."*

144.   Between on or about June 20, 2005 and August 1, 2005, the Plaintiff remained employed as an Assistant United States Attorney, working from home under the onerous, highly stressful, embarrassing and retaliatory scenario imposed upon him by the Defendants PAUL I. PEREZ, JAMES R.KLINDT and ROBERT E. O'NEILL.   During this period of time, the Plaintiff was preparing to defend himself from the wrongful personnel action lodged against him, and was performing his duties as directed.

Plaintiff's wife was several months pregnant in a so-called "high risk" pregnancy, and also was under intense pressure, causing her unnecessary and undue complications with the pregnancy.  In this regard, Plaintiff and his spouse had already suffered two prior miscarriages, all brought on by the intense and unnecessary stress being put upon the Plaintiff at work by the conspirators, including Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT, *inter alia.*

145.   Between on or about January 2005 and July 12, 2005, Defendant PAUL I. PEREZ repeatedly denied requests from lawyers representing Charles B. Wells and others for the testimony of Defendant ROBERT E. O'NEILL in the case of *Del Fuoco v. Wells.*

146.  Subsequent to the events of June 17, 2005 involving the Plaintiff, and in a clear effort to force the Plaintiff's resignation from the DOJ, Defendant PAUL I. PEREZ completely reversed course and authorized and directed Defendant ROBERT E. O'NEILL to testify on behalf of the defense in Plaintiff's lawsuit against Sheriff Charles B. Wells in Case No. 8:03-cv-161-T-23TGW, then pending in the U.S. District Court.

147.   In days leading up to this authorization, Defendant ROBERT E. O'NEILL made comments to certain other AUSAs stating *inter alia,*  that Plaintiff was a *"lying motherfucker"* and that he (Defendant ROBERT E. O'NEILL) was "itching to testify", or words to that effect.  During this period of time, Defendant ROBERT E. O'NEILL was maintaining regular and direct contact with certain lawyers on Wells' legal team, and was commiserating behind the scenes in an effort help Wells "beat" the lawsuit filed by Plaintiff against him and others for the illegal stalking, surveillance and threats against Plaintiff and his family members.

148.  On or about July 12, 2005, co-conspirator Warren A. Zimmerman authored and

sent a letter to one of Wells' counsel in Plaintiff's lawsuit, telling that lawyer in part that

"the United States Attorney (Defendant PAUL I. PEREZ) has approved your written

request to take the oral deposition of AUSA Robert O'Neill".  This letter then went on to

say that the testimony would be "subject to the express limitation that the deposition be

limited to three questions as follows:

> * While the Delta investigation was pending, did AUSA Del Fuoco
> ever communicate to you that anyone associated with the Sheriff's
> Office was intimidating him or trying to prevent him from discharging
> His duties by force, intimidation or threat?
>
> * While the Delta investigation was pending, based upon your personal
> observation or through communication to you in your supervisory
> capacity, did you become aware that anyone associated with the
> Sheriff's Office was intimidating AUSA Del Fuoco or trying to
> prevent him from discharging his duties by force, intimidation or
> threat?
>
> * While the Delta investigation was pending, did you hear AUSA Del
> Fuoco state, in more words or less, that he would do anything to get
> Sheriff Wells?"

This letter went on to state that "(f)ollow-up questions will be narrowly circumscribed to

conform to these limitations."

A complete copy of this letter is attached hereto and incorporated herein as

Exhibit I.

149.  Given the foregoing authorization, the sum total and scope of Defendant ROBERT

E. O'NEILL's authority to testify was limited to the 3 narrowly drawn areas delineated

therein.

150.  On or about July 12, 2005, Defendant ROBERT E. O'NEILL, accompanied by co-

conspirator Warren A. Zimmerman, appeared at a location in Tampa, Florida to render

testimony in the case of *Del Fuoco v. Wells, e al.,* Case No. 8:03-161-T-23TGW.   After

first being duly sworn, Defendant ROBERT E. O'NEILL (aided and abetted by co-

conspirator Warren A. Zimmerman) knowingly and willfully exceeded the scope of his

authority outlined in the foregoing *Touhey* authorization letter, and maliciously and

wantonly used the opportunity to testify as a "launching pad" to commit perjury, to

obstruct justice, to defame the Plaintiff *per se* and to otherwise cause severe harm to the

Plaintiff's case against then-defendant Charles B. Wells and others who were engaged in

illegal activity directed at Plaintiff's family.   This disgraceful performance by Defendant

ROBERT E. O'NEILL was sanctioned and later ratified by Defendant PAUL I. PEREZ,

and it was further aided and abetted by Zimmerman, who sat by and allowed Defendant

ROBERT E. O'NEILL to perpetrate a fraud upon the U.S. District Court with the clear

and unequivocal intent to cause severe and lasting harm to Plaintiff, his professional

reputation and his standing as a long-time member of the DOJ.   As amply documented

herein, the motive for all of this chicanery centered around a desire to curry favor with

the Bush Administration by bestowing upon Charles B. Wells undeserved and corrupt

support and comfort, while at the same time forsaking the interests of the Plaintiff and his

family.   A further motive was retaliation against the Plaintiff for his lawful efforts at

performing his job as an Assistant United States Attorney all free from political pressure,

self-interest and self-dealing, and to force the Plaintiff's constructive discharge from

government employment.

**\* Perjury Concerning the Evidence In the Wells Investigation**

151.   On or about July 12, 2005, Defendant ROBERT E. O'NEILL uttered the sworn

testimony that is attached hereto and incorporated herein as <u>Exhibit J</u>.   During said sworn

testimony, Defendant ROBERT E. O'NEILL committed and uttered the following acts of

material perjury, among others, all as **underscored in bold type**, and all in connection

with the burgeoning mass of evidence (known to Defendant ROBERT E. O'NEILL at

times pertinent and material) that Sheriff Charles B. Wells was involved in a scheme to

illegally receive approximately $8.5 million from out-of-state banks on so-called "lease-

buyback" transactions while wrongfully using public property as collateral therefore:, and

to defraud the IRS of tax monies due and owing on the transactions at issue:

Page 8, Lines 1 and 2:

**"There was no evidence that it did"**

Page 8, Lines 9 and 10:

**"During the time I was in charge of public corruptions(sic), that never came up**

**once"**

Page 8, Lines 12, 13, 14:

**"Not even in a veiled, straightforward, in any way, shape, or form when I was in**

**charge of that section."**

Page 8, Lines 19, 20:

**"He would never have any evidence."**

Page 8, Line 25:

**"None . . ."**

Page 9, Lines 1, 2:

**". . . (I)t would never be anything.  He would say, I know I don't have anything yet"**

Page 9, Lines 20, 21, 22:

**"No. That topic never came up once when I was in charge of public corruption.**

**The first it came up was when I was chief of the Criminal (D)ivision . . ."**

Page 12, Lines 5, 11, 12, 13:

**"He did later . . .Nothing ever came to my attention that he was not fulfilling his**

**duties because he was being intimidated by anybody. He never mentioned that."**

Page 18, Lines 4, 5:

**"He never talked factually about any evidence. He never had any evidence."**

Page 18, Lines 7, 8, 9:

**"He never talked factually about the evidence. He never had any evidence."**

Page 21, Lines 8, 9:

**"He was fixated on Charlie Wells. I have no idea why."**

Page 42, Lines 11, 12, 13:

**"He was doing things that his supervisors didn't know about, and that was a**

**problem in the criminal investigation."**

**\*   Retaliation Against A Federal Witness (18 U.S.C. 1513(e)) and Additional**

**Perjury**

152.   On or about July 12, 2005, Defendant ROBERT E. O'NEILL further materially

perjured himself while testifying under oath in the case of *Del Fuoco v. Wells*, No. 8:03-

cv-161-T-23TGW and in connection with threats of bodily injury the Said Defendant

ROBERT E. O'NEILL uttered to Plaintiff through AUSAs Jeffrey S. Downing, Ernest F.

Peluso and Robert Mosakowski in the Federal workplace and during the Federal work

day, all as **underscored in bold type**. The purpose for the said Defendant ROBERT E.

O'NEILL's perjury was to conceal and hide the fact that he had uttered terroristic threats

of bodily injury to Plaintiff, then an attorney in the Office of the U.S. Attorney, all through subordinates of his, and all during the Federal work day, in violation of Federal criminal law, DOJ regulations and U.S. Government rules providing for a safe and secure Federal workplace:

Page 40 (Lines 5, 6, 7, 8, 9, 10, 11):

Defendant O'NEILL: ". . .(Del Fuoco) filed allegations against me with the Department of Justice."

Q. **The OPR Complaint?**  (Emphasis supplied).

Defendant O'NEILL: "Yes."

Q. The OPR complaint against you, in your mind, that causes you no animosity?

Defendant O'NEILL:  *"It causes me tremendous animosity."*  (Emphasis supplied).

\*     \*     \*

Page 42 (Line 25), Page 43 (Lines 1, 2, 3, 4, 5, 6, 7, 8, 9, 10):

Q.  Did you recently ever make any statements that you would meet Jeff Del Fuoco?

Defendant O'NEILL: "Absolutely.  Anywhere, any time."

Q. Give me the context of those statements that you made to people in the office about Jeff.

Defendant O'NEILL:  **"I didn't make it to people in the office."**

Q. You didn't?

Defendant O'NEILL:  **"Not in the office, no."**

Q. Who did you make it to?

Defendant O'NEILL:   "To Jeff Downing.  **"When we were outside the hearing for Judge Holder. . ."**

\*    \*    \*

Page 43 (Line 25), Page 44 (Line 1, 2, 3, 4, 5, 6, 7):

Q. Did you actually say that you would meet him anywhere and kick his fucking ass or something along those lines?

Defendant O'NEILL:   **"Probably not like that, but those words could have come up."**

Q.  What words did you use?

Defendant O'NEILL:  **"I don't remember.  I said I would meet him anywhere."**

\*    \*    \*

Page 44 (Line 24, 25), Page 45 (Line 1, 2, 3, 4):

Defendant O'NEILL: "If he would like to put on boxing gloves, that would be great with me.  I would be more than happy. . . Del Fuoco tried to derail my entire professional career. . . . He made allegations that were just absurd. . . ."

**\*  Defamation *Per Se* and Violations of the Privacy Act of 1974 (5 USC 552a)**

153.  On or about July 12, 2005, Defendant ROBERT E. O'NEILL engaged in false, malicious, intentional, willful and defamatory *per se* conduct, all in violation of the Privacy Act of 1974, and all in an effort to harm the Plaintiff's employment relationship with the DOJ, his personal and professional reputation in the community, and to cause him to suffer ridicule, scorn contempt and hatred by testifying under oath falsely and with malice in a deposition in the case of *Del Fuoco v. Wells, et al,* Case No. 8:03-cv-161-T-23-TGW as **underscored in bold type** as follows, *inter alia*:

Page 45 (Line 11, 12, 13, 14, 15, 16, 17):

**"He got thrown out of (S)pecial (P)rosecutions"**

**"He got thrown out of the Criminal (D)ivision"**

**"He doesn't seem to be in the Civil (D)ivision any longer"**

**"And I used to say a long time ago, there's something wrong with this guy"**

**"Somebody needs to check this guy out."**

Page 45 (Line 21, 22, 23)

**"I told that to everybody in the Department of Justice within our office.**

**Obviously, he's got a mental problem . . . ."**

Page 46 (Line 3, 4, 8, 9)

**". . . Donna Bucella asked me to come to (S)pecial (P)rosecutions to baby-sit Jeff.**

**. . . For the whole time I baby-sat, he did not get in trouble one time . . . "**

Page 47 (Line, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17)

**"He needs to be checked out"**

**"Bob Mosakowski, who runs Tampa, I had numerous conversations that the guy**

**is mentally ill.  He obviously has some problem.  I'm not a psychiatrist.  Its taken**

**them three years to do any sort of personnel action after all of this."  (The)**

**Federal Government is a funny thing, but there is something mentally wrong**

**with that guy . . . (H)e went off the deep end.  When he did, he went way off the**

**deep end."**

154.  On or about July 14, 2005, the Plaintiff wrote a letter to Alberto Gonzalez, then President George W. Bush's Attorney General, in another futile attempt at seeking help from the Republican Administration in Washington from Defendant ROBERT

E. O'NEILL's threats of physical violence in the workplace.  The letter is attached

hereto and incorporated herein as Exhibit K..  As usual, no action was ever taken.

155.  On or about July 18, 2005, Defendant ROBERT E. O'NEILL had the

opportunity to review the entirety of the testimony he rendered on July 12, 2005 and

to make any changes or corrections to the transcript that he felt necessary, as is

standard in civil trial practice.  In this regard, Defendant ROBERT E. O'NEILL

signed and certified an *errata* sheet on that date and declared that he had no

substantive changes, and the foregoing testimony became his testimony of record in

Case No. 8:03-cv-161-T-23TGW.

156.  On or about July 18, 2005, counsel for then-defendant Charles B. Wells and his

co-defendants entered the false and defamatory *per se* testimony detailed hereinabove

into the record of the Plaintiff's civil case against Wells and the MCSO during the

course of a hearing held on that date in U.S. District Court.  Present at this hearing

were one or more defense attorneys with whom Defendant ROBERT E. O'NEILL

had been previously commiserating prior to rendering the false testimony described,

as well as members of the media.  Co-conspirator Warren A. Zimmerman was also

present and participated in presenting the false and defamatory testimony into the

record of the Court, telling the Court that Defendant ROBERT E. O'NEILL would

not be available for cross-examination on his perjured testimony..

157.  On or about July 19, 2005, the *St. Petersburg Times* ran a story entitled

"Prosecutor denies erratic behavior", and written by Candace Rondeaux, one of the

same reporters that Defendant ROBERT E. O'NEILL "leaked" information to about

the Plaintiff's alleged "firing".  In the story, which claimed that "(a) supervisor had

described a decline in Jeffrey Del Fuoco's behavior for a sanctions hearing", Ms.

Rondeaux reported and repeated portions of Defendant ROBERT E. O'NEILL's false

and defamatory *per se* testimony for the entire newspaper reading public to see.  A

complete copy of this article (in "on-line" format) is attached hereto and incorporated

herein as Exhibit L.   The newspaper correctly reported that Plaintiff refuted

Defendant ROBERT E. O'NEILL's attacks, and that Defendant ROBERT E.

O'NEILL "was trying to get back at him" (all as demonstrated by the facts in this

Complaint) for "fil(ing) a complaint against O'Neill with the Department of Justice."

158.   On or about July 19, 2005, the Plaintiff and his family had had enough abuse

and torment, and decided to leave the DOJ, which had been his life's work until the

co-conspirators began their illegal activities, all as detailed herein.  Most importantly,

however, the Plaintiff's concern for his family, which had long suffered throughout

the entire ordeal described herein, was on the "brink" of falling apart.  Plaintiff's wife

(who as noted, was at the time pregnant with their son in a high-risk pregnancy) was

suffering immeasurably from all of the adverse attention, and she was at risk for

another miscarriage from the stress.  A complete copy of Carla J. Del Fuoco's

Affidavit, filed with the U.S. Merit Systems Protection Board, is attached hereto and

incorporated herein as Exhibit M., and details some of the facts leading up to

Plaintiff's constructive discharge, effective on August 1, 2005.

159.   On or about July 28, 2005, the Plaintiff wrote to Defendant PAUL I. PEREZ

(through co- conspirator Warren E. Zimmerman) in a so-called *Touhey* request, and

informed PEREZ about Defendant ROBERT E. O'NEILL's perjury, obstruction of

justice and threats against the Plaintiff, all as outlined herein.  A complete copy of

this letter is attached hereto and incorporated herein as <u>Exhibit N.</u>.  In that

correspondence, Plaintiff told Perez that he had resigned his position as of August 1,

2005, and further informed Perez that his "decision to do so was driven by

(Defendant ROBERT E.) O'NEILL's threats and outrageous conduct . . . all which

has effectively forced my hand and made it impossible to continue as an AUSA in

this district."  Defendant PAUL I. PEREZ ignored the request and did nothing about

Defendant ROBERT E. O'NEILL'S misconduct.  According to Defendant PAUL I.

PEREZ's excuse-making, Plaintiff was attempting to "annoy, embarrass and oppress"

Defendant ROBERT E. O'NEILL by making his request.

160.  On or about August 1, 2005, the Plaintiff suffered his constructive and

wrongful discharge from the U.S. Department of Justice, all as outlined herein.

161.  On or about August 2, 2005, Plaintiff again wrote to Attorney General Alberto

Gonzalez and asked for help and an investigation into Defendant ROBERT E.

O'NEILL's corrupt conduct, again all to no avail.  In that letter, Plaintiff told the

Attorney General that "(i)t is inexcusable for any AUSA, let alone one who holds the

tope management position in the Criminal Division, to conduct himself in the manner

described."  A complete copy of the letter is attached hereto and incorporated herein

as <u>Exhibit O</u>.

162.  On or about August 12, 2005, an article appeared in the *St. Petersburg Times*

concerning the Plaintiff, Defendant ROBERT E. O'NEILL and the Plaintiff's

constructive discharge from the DOJ.  In that article, entitled, "Prosecutor Resigns,

To Become Defense Lawyer", reporter Candace Rondeaux (the same reporter who

earlier had falsely reported that Plaintiff had been "fired") wrote that Defendant

ROBERT E. O'NEILL "stood by" his July 12, 2005 testimony as the "truth", thus again republishing his false, defamatory *per se* words and criminal actions for all to see and talk about.  In the same article, Defendant ROBERT E. O'NEILL is quoted as stating that "*everybody in the (U.S. Attorney's) (O)ffice was concerned about his mental health.*"  A complete "on-line" copy of the article (retrieved from the Internet as of 6/29/09) is attached hereto and incorporated herein as <u>Exhibit P.</u>

163.   On or about January 20, 2006, another article appeared in the *St. Petersburg Times,* written by reporter Shannon Colavecchio-Van Sickler.   Reporting on the Plaintiff's plans to form a non-profit "whistleblower" organization, the story then went on to refer to Defendant ROBERT E. O'NEILL's false and defamatory statements of July 12, 2005, reporting that "his former supervisor (Defendant O'NEILL) said in a July sworn statement that *Del Fuoco's behavior had become erratic.*"

164.   On or about March 30, 2006, an article appeared in the *Detroit News* about the case of a client that Plaintiff was representing in a Federal criminal matter in Detroit, Michigan, in the Eastern District of Michigan.  The article, written by Reporter Paul Egan of the *Detroit News*, repeated and realleged several of the false, defamatory *per se* and completely outrageous comments of Defendant ROBERT E. O'NEILL during his perjurious testimony of July 12, 2005.  At the time, Plaintiff was the lead counsel in the case.  After the publishing of the article, Plaintiff's client replaced him as lead counsel in the matter, and told him that he had done so as a result of Defendant ROBERT E. O'NEILL's false and defamatory *per se* comments about the Plaintiff,

all as set forth, *infra*, to include comments about the Plaintiff being "mentally ill" and being "thrown out" of the DOJ, *inter alia*.

165. In the March 30, 2006 *Detroit News* article, Reporter Paul Egan made reference to Defendant ROBERT E. O'NEILL's malicious comments about the Plaintiff's "jockstrap" hanging at the U.S. Attorney's Office. What Defendant ROBERT E. O'NEILL intended was to imply that Plaintiff had a "mental problem" concerning the jockstrap. Of course, what Defendant ROBERT E. O'NEILL failed to say was that the "jockstrap" was part of the Plaintiff's (a U.S. Army Reserve Colonel) rigorous and regular physical fitness regimen, undertaken daily at lunch-time during his tenure as an Assistant United States Attorney. In any event, Plaintiff's "jockstrap" had nothing to do with Defendant ROBERT E. O'NEILL's testimony, and the comments about it were clearly meant to harm and to damage the Plaintiff's reputation, as well as to wrongfully invade his privacy by placing him in a false light.

166. Since on or about the times of the reported facts and evidence in this Complaint up to and including the present, Plaintiff JEFFREY J. DEL FUOCO has suffered continuing and severe damage to his reputation, livelihood and career as a lawyer, all as a result of the co-conspirators' wrongful and criminal actions. Plaintiff has also suffered severe emotional distress, alienation and has been shunned by members of his former profession, other members of the community and in his bid for elective political office. Plaintiff's family has also suffered immeasurably, all as detailed in the Affidavit of Carla J. Del Fuoco, addressed herein. This damage is continuing to be caused in part by the lasting, permanent nature of Defendant ROBERT E. O'NEILL's false, defamatory and malicious statements, all permanently

archived on the Internet in various blogs, chats and websites, including the website,

"LEOAffairs.com", *inter alia.*

167.   Furthermore, since on or about the times of the reported facts and evidence in

this Complaint up to an including the present time, the Plaintiff has attempted to get

help and "justice" from the very Department of the U.S. Government that carries that

word as a part of its name.   An example is the attached letter sent to former Attorney

General Michael B. Mukasey on January 13, 2008, which is incorporated herein as

Exhibit Q.   That help has never come, primarily because of the partisan, Republican

political "agenda" set forth and detailed amply herein.   Instead, Republican politics

has rewarded Defendants ROBERT E. O'NEILL, PAUL I. PEREZ, JAMES R.

KLINDT and other co-conspirators for their complicity, and has made a mockery of

the U.S. Department of Justice.   As such, Plaintiff must finally rely on the Court to

get the true justice he now seeks and amply deserves.   Furthermore, as the attached

editorial page from the April 6, 2008 edition of the *St. Petersburg Times* implores, the

obstructed investigation of Charles B. Wells and his illegal financial dealings "merits

a closer look."   Exhibit R.

All in violation of Title 42, United States Code, Section 1985(1) and the law of

conspiracy.

## COUNT TWO

### Civil Rights (*Bivens* Action) – 5th Amendment Liberty Interest

168.   Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations

contained in Paragraphs 1 though 167, inclusive.

169.   As a result of the wrongful actions of Defendants ROBERT E. O'NEILL,
PAUL I. PEREZ and JAMES R. KLINDT, aided and abetted by each other and all
taken outside the scope of their employment as members of the U.S. Department of
Justice as set forth herein, the Plaintiff was deprived of his right to liberty without due
process of law, including, *inter alia,* his right to pursue his trade and profession as an
Assistant United States Attorney and as an Attorney-at-Law all free from improper
retaliation, defamation *per se* and from the wrongful and illegal release of the false,
defamatory, incomplete and misleading information described herein, and all free
from harassment, ridicule, scorn, contempt and threats of assault and bodily injury, as
well as improper comments about his Italian-American heritage and Roman Catholic
religious preferences.

170.   As a further result of the wrongful actions of Defendants ROBERT E.
O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT, aided and abetted by each
other and all taken outside the scope of their employment as members of the U.S.
Department of Justice, the Plaintiff was deprived of his right to liberty without due
process of law, all free from improper defamation *per se*, and from the wrongful and
illegal release of false, defamatory, incomplete and misleading information as
described herein.

**COUNT THREE**

**Civil Rights (*Bivens* Action) – 5th Amendment Property Interest**

171.   Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations
contained in paragraphs 1 through 170, inclusive.

172.  As a further result of the wrongful actions of Defendants ROBERT E.

O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT, aided and abetted by each

other and by others and all taken outside the scope of their employment as members

of the U.S. Department of Justice as set forth herein, the Plaintiff was further

deprived of his property interests without due process of law, including *inter alia*, his

right to pursue his career as an Assistant United States Attorney and as an Attorney-

at-Law, all free from tampering and obstruction, false accusation, defamation *per se*

and misleading, incomplete and outright falsehoods wrongfully casting him in a false

light and otherwise, and all free from fear and apprehension of assault and bodily

injury, ridicule, scorn, contempt and improper comments about his Italian-American

heritage and his Roman Catholic religious preferences.

173.  As a further result of the wrongful actions of Defendants ROBERT E.

O'NEILL, PAUL I. PEREZ and  JAMES R. KLINDT, aided and abetted by each

other and all taken outside the scope of their employment as  members of the U.S.

Department of Justice as set forth herein, the Plaintiff was further deprived of his

property interests without due process of law, including *inter alia*, his right to be free

from the wrongful, constructive discharge he suffered on August 1, 2005, and all as a

result of the false accusation, defamation *per se* and misleading, incomplete and

outright falsehoods wrongfully casting him in a false light and otherwise, wrongfully

interfering with his family's well-being and safety, threats of bodily injury and

assault, ridicule, scorn, contempt and improper comments about his Italian-American

heritage and Roman Catholic religious preferences.

## COUNT FOUR

### Tortious Interference With Employment Relationship

174.  Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations

contained in Paragraphs 1 through 173, inclusive.

175.  Plaintiff had an existing employment relationship with the U.S. Department of

Justice as an Assistant United States Attorney, all as set forth herein.

176.  Defendant ROBERT E. O'NEILL had knowledge of Plaintiff's employment

relationship with the U.S. Department of Justice, all as set forth herein.

177.  Acting with intent, malice and outside the scope of his authority as a DOJ

employee himself, Defendant ROBERT E. O'NEILL intentionally and unjustifiably

interfered with the employment relationship Plaintiff had with the U.S. Department of

Justice by such actions that include, but are not limited to, threats of physical violence

and assault in the workplace, defamation *per se,* perjury, obstruction of justice, unlawful

retaliation against a witness, abuse of authority and a position of trust, the leaking of

Privacy Act protected information about the Plaintiff, and all of the other acts referred to

herein, as if set forth fully.

178.  As a result of the said wrongful interference with Plaintiff's employment

relationship, Defendant ROBERT E. O'NEILL caused severe and lasting damage to the

Plaintiff.

## COUNT FIVE

### Assault

179.  Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations contained

in Paragraphs 1 through 178, inclusive.

180.  Defendant ROBERT E. O'NEILL, acting outside the scope of his employment as an employee of the DOJ, made an intentional, unlawful threat of corporal injury to Plaintiff by threatening force directed toward Plaintiff's person at Plaintiff's place of work, *to wit*:  the Office of the U.S. Attorney, Tampa, Florida by threatening to "whip Plaintiff's motherfucking ass", *inter alia*.

181.  Given the proximity to Plaintiff's work place and shared common areas in the U.S. Attorney's Office, said threats created a fear of imminent peril to Plaintiff, who feared physical battery from the said Defendant ROBERT E. O'NEILL.

182.  Defendant ROBERT E. O'NEILL had the apparent present ability to effectuate the said assault.

## COUNT SIX

### Intentional Infliction of Emotional Distress

183.  Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations contained in Paragraphs 1 through 182, inclusive.

184.  Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT, acting in concert and outside the scope of their employment with the DOJ, engaged in wanton, intentional and reckless conduct, as set forth herein.

185.  Defendants' conduct was outrageous.

186.  Defendants' conduct caused Plaintiff emotional distress.

187.  As a result of the Defendants' conduct, Plaintiff suffered severe emotional distress.

## COUNT SEVEN

### Invasion of Privacy – False Light

188.   Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations contained in Paragraphs 1 through 187, inclusive.

189.   As stated in detail herein, Defendant ROBERT E. O'NEILL aided and abetted by Defendant PAUL I. PEREZ, and acting outside the scope of their employment with the DOJ, uttered and caused to be published false statements and testimony that placed Plaintiff in a false light and in a manner which is highly offensive to a reasonable person.

190.   The wrongful and malicious actions of Defendants violated Plaintiff's right of privacy by placing Plaintiff in a false light before the eyes of the public, his fellow DOJ employees, the Department of Justice itself, his family, friends and members of the legal community, *inter alia.*

191.   As a direct and proximate result of the actions of Defendants, Plaintiff suffered and continues to suffer great damage, humiliation, severe mental pain and anguish, *inter alia.*

192.   Defendants knew and should have known that their wrongful actions and statements would subject Plaintiff to such losses and damages.

## COUNT EIGHT

### Invasion of Privacy – Public Disclosure of Private Facts

193.   Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations contained in Paragraphs 1 through 192 inclusive.

194.   As stated herein, Defendants ROBERT E. O'NEILL and PAUL I. PEREZ, acting in concert and acting outside the scope of their employment with the DOJ, and aiding and abetting each other, uttered and caused to be published injurious facts and falsehoods

about the Plaintiff's employment status with the U.S. Department of Justice. These facts were protected by the Privacy Act of 1974, and by privacy interests of the common law. As such, they were not of legitimate public concern.

195. The wrongful and malicious actions of Defendants ROBERT E. O'NEILL and PAUL I. PEREZ violated Plaintiff's right of privacy by disclosing defamatory *per se* facts that were not of legitimate public concern, and which were protected from disclosure by Federal law, *inter alia.*

196. As a direct and proximate result of such wrongful disclosures by Defendants ROBERT E. O'NEILL and PAUL I. PEREZ, Plaintiff suffered and continues to suffer great humiliation, severe mental pain and anguish, *inter alia.*

197. Defendants ROBERT E. O'NEILL and PAUL I. PEREZ knew and should have known that their wrongful disclosures would subject Plaintiff to such losses and damages.

## COUNT NINE

### Negligent Supervision

198. Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations contained in Paragraphs 1 through 197, inclusive.

199. Defendants PAUL I. PEREZ and JAMES R. KLINDT were aware, became aware and should have been aware of problems with Defendant ROBERT E. O'NEILL that indicated his unfitness to continue on in his duties as a supervisory AUSA, including, *inter alia,* the said Defendant ROBERT E. O'NEILL's perjury, obstruction of justice, numerous conflicts of interest, retaliatory *animus* toward the Plaintiff, and his outright threats of violence directed at Plaintiff in the workplace.

200.   Defendants PAUL I. PEREZ and JAMES R. KLINDT owed a duty to the Plaintiff to protect the Plaintiff from the injury and damage inflicted on the Plaintiff, as detailed herein.

201.   Acting outside the scope of their employment, duties and responsibilities as the U.S. Attorney and First Assistant U.S. Attorney for the Middle District of Florida and failing to act in conformance therewith, Defendants PAUL I. PEREZ and JAMES R. KLINDT breached their duties as DOJ managers by failing to take action against the said Defendant ROBERT E. O'NEILL, to include investigation, discharge or reassignment, *inter alia.*

202.   Defendants PAUL I. PEREZ's and JAMES R. KLINDT's breach of their duties was and is the proximate cause of injury and damage to the Plaintiff.

203.   Plaintiff suffered and continues to suffer damages (physical and mental), emotional distress, loss of reputation, standing, and all of the other damages listed herein as a result thereof.

## COUNT TEN

### Tortious Interference with Cause of Action

204.   Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations contained in Paragraphs 1 through 203, inclusive.

205.   Plaintiff had a cause of action and was the plaintiff in the case of *Del Fuoco v. Wells, et al.* 8:03-cv-161-T-23TGW, U.S. District Court, Middle District of Florida.

206.   Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT knew of and were aware of Plaintiff's cause of action.

207.  Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT, acting outside the scope of their authority, intentionally, wrongfully and unjustifiedly interfered with Plaintiff's said cause of action by testifying falsely and fraudulently in proceedings therein, all as set forth, *supra;* by defaming the Plaintiff; by invading his privacy; by casting him in a false light and by condoning and aiding and abetting the same; and by punishing the Plaintiff for bringing said cause of action, all as set forth herein.

208.  As a result of Defendants' wrongful actions in interfering with the said cause of action, the Plaintiff suffered damages.

**COUNT ELEVEN**

**Breach of Fiduciary Duty**

209.  Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations contained in Paragraphs 1 through 208, inclusive.

210.  Plaintiff and Defendant PAUL I. PEREZ shared a subordinate – superior relationship as Federal prosecutors and members of the U.S. DOJ.

211.  The President of the United States, on behalf of the Plaintiff as a DOJ employee and as a subordinate, reposed trust and confidence in Defendant PAUL I. PEREZ to fulfill his office as United States Attorney for the Middle District of Florida, all according to the Constitution of the United States and the law, including laws prohibiting retaliation against employees and laws meant to protect subordinates from harm and maltreatment, *inter alia*, all as set forth herein.

212.  By accepting appointment as United States Attorney, Defendant PAUL I. PEREZ undertook such trust and assumed a duty to advise, counsel and protect Plaintiff.

213. Defendant PAUL I. PEREZ breached his duties to the Plaintiff, all as aforesaid.

214. As a result of that breach, the Plaintiff suffered damages.

## COUNT TWELVE

### Breach of Fiduciary Duty

215. Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations contained in Paragraphs 1 through 214, inclusive.

216. Plaintiff and Defendant JAMES R. KLINDT shared a subordinate-superior relationship as Federal prosecutors and members of the U.S. DOJ.

217. The Attorney General of the United States, on behalf of the Plaintiff as a DOJ employee and as a subordinate, reposed special trust and confidence in Defendant JAMES R. KLINDT to fulfill his office as an Assistant United States Attorney for the Middle District of Florida all according to the Constitution of the United States and the law, including laws prohibiting retaliation against employees and laws meant to protect subordinates from harm and maltreatment, *inter alia.*

218. By accepting appointment as an Assistant United States Attorney, Defendant JAMES R. KLINDT undertook such trust, and continued thereafter subsequent to becoming the First Assistant United States Attorney, assuming a duty to advise, counsel and protect the Plaintiff.

219. Defendant JAMES R. KLINDT breached his duties to the Plaintiff, all as aforesaid.

220. As a result of that breach, the Plaintiff suffered damages.

## COUNT THIRTEEN

### Neglect and Refusal to Act (42 U.S.C. 1986)

221.  Plaintiff JEFFREY J. DEL FUOCO repeats and realleges the allegations contained in Paragraphs 1 through 220, inclusive.

222.  Defendants ROBERT E. O'NEILL, PAUL I. PEREZ, and JAMES R. KLINDT had knowledge of the wrongs conspired to be done and mentioned in 42 U.S.C. 1985(1), which wrongs are set forth fully herein, and which were about to be committed and were in fact committed.

223.  Defendant PAUL I. PEREZ, as the United States Attorney in and for the Middle District of Florida; Defendant JAMES R. KLINDT as the First Assistant United States Attorney in and for the Middle District of Florida, and Defendant ROBERT E. O'NEILL, as the Chief of the Criminal Division in and for the Office of the United States Attorney for the Middle District of Florida, had the power to prevent and to aid in preventing the commission of the same.

224.  By such refusal to act, Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT breached their duty to do so, thus acting outside the scope of their employment and duties as Criminal Division Chief, United States Attorney and as First Assistant United States Attorney in and for the Middle District of Florida in an effort to shield and protect the wrongdoers, including, *inter alia,* Defendant ROBERT E. O'NEILL, Warren A. Zimmerman, James R. Klindt, Charles B. Wells, Larry Bahnsen, certain members of the DELTA Squad of the MCSO,  certain persons associated with Plant City, Florida, the PCPD and others, *inter alia.*

225.  Plaintiff JEFFREY J. DEL FUOCO suffered damages as a result of the wrongful acts and omissions set forth herein;

226.  Defendants ROBERT E. O'NEIIL,  PAUL I. PEREZ and JAMES R. KLINDT are liable to Plaintiff JEFFREY J. DEL FUOCO for said damages caused to Plaintiff by the said wrongful acts, since Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT, by the use of reasonable diligence, could have prevented such wrongful acts, and could have aided in the prevention of them, including the wrongful, criminal and tortious acts of the said persons and conspirators, and since, Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT neglected and refused to do so.

WHEREFORE, Plaintiff JEFFREY J. DEL FUOCO demands judgment against Defendants ROBERT E. O'NEILL, PAUL I. PEREZ and JAMES R. KLINDT on all counts and requests the following relief:

(1)  Declare that the Defendants conspired to and did violate the Privacy Act of 1974, 5 U.S.C. Section 552a, *et seq.;*

(2)  Award Plaintiff actual and compensatory damages;

(3)  Award Plaintiff punitive damages for the wanton, willful and malicious conduct amply described in this Complaint;

(4)  Award Plaintiff his attorney's fees, costs and interest;

(5)  Award Plaintiff any other relief that this Court deems just and proper.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully submitted this 6th day of

July, 2009

Jeffrey J. Del Fuoco, Esquire
Plaintiff, *Pro Se*
1579 Eagles Reach
Tarpon Springs,  FL  34688
(727) 267-8718